*In re* ADOPTION OF CHRISTINA MARIE SMITH, a/k/a Christina Smith, a Minor.—(GEORGE SMITH *et al.*, Petitioners-Appellants, *v.* CHRISTINA MARIE SMITH, a/k/a Christina Smith, a Minor, *et al.*, Respondents-Appellees.)

Fourth District   No. 12735

Opinion filed May 13, 1976.

Hagin Harper, of Champaign, for appellants.

William J. Scott, Attorney General, of Springfield, and James R. Burgess, Jr., State's Attorney, of Champaign (Frank J. Kopecky, Assistant Attorney General, and Anita Crawford, Assistant State's Attorney, of counsel), for appellee Department of Children and Family Services.

Lawrence Eaton, of Eaton & Finson, of Monticello, and Burt Greaves, of Champaign, for appellee Christina Smith.

Mr. JUSTICE BARRY delivered the opinion of the court:

On December 6, 1972, George and Natalie Smith, nonresidents of Illinois, filed in the Circuit Court of Champaign County, as cause 72-A-135, a petition to adopt their granddaughter, Christina Marie Smith, born March 29, 1970, in California as the daughter of William and Mary Smith. Attached to the petition were the executed consents of both natural parents together with their written entries of personal appearances in the adoption proceeding. William Smith is the natural son of Natalie Smith and the adopted son of George. The petition alleged that Christina is a resident of Illinois and that the only orders entered affecting her custody were those entered in Champaign County Circuit Court cause 71-J-116 commenced July 16, 1971, under the Juvenile Court Act by the Department of Children and Family Services, (hereinafter called "Department"), to have Christina declared a neglected child and a ward of the court, all of which orders in 71-J-116 were alleged to have been terminated on September 14, 1972. Burt Greaves, a Champaign attorney, was appointed guardian ad litem for the infant. On May 2, 1974, a minute entry was made to the docket reciting *inter alia*, "The parties hereto agree to a consolidation of causes 71-J-116 and 72-A-135." Following a hearing before the court on this consolidated cause, the circuit judge announced his finding that George and Natalie Smith qualify as adoptive parents in every respect but that the best interests of the child required the denial of their petition. Accordingly there was entered on June 7, 1974, a dispositional order denying and dismissing the adoption petition and placing the infant ward under the guardianship of Richard Laymon of the Illinois Department, with authority to consent to the minor's adoption. George and Natalie Smith have prosecuted this appeal claiming only (1) that the circuit court abused its discretion in denying their petition for adoption, and (2) erred in refusing to admit to evidence Petitioner's Exhibit A (which is a seven-page report of Dr. James R. Richmond, dated March 29, 1973), and (3) that the record shows such over-reaching and domination by agents of the Department as to have contaminated the proceedings and produced an unjust result. Since the welfare and best interests of a child are involved, we are not required to limit our review of the record to the points of concern raised by appellants. *Muscarello v. Peterson*, 20 Ill. 2d 548, 170 N.E.2d 564 (1960); *Layton v. Miller*, 25 Ill. App. 3d 834, 322 N.E.2d 484 (5th Dist. 1975); *Phelan v. Santelli*, 30 Ill. App. 3d 657, 334 N.E.2d 391 (3d Dist. 1975).

The report of Dr. Richmond is essentially a psychiatric evaluation made of George and Natalie Smith by a California practitioner at the suggestion of the Smiths' California counsel upon the premise that it might be useful in prosecuting this adoption petition in Illinois. It contains a recitation of the history of this case as related to him in separate

interviews of the grandparents. Much of this history was produced to the court by direct testimony of many witnesses, and, since the finding of the circuit court that George and Natalie Smith qualify in every way as adoptive parents is fully consistent with the conclusions of Dr. Richmond's report, and with our own view of the record, no prejudicial error derived from the ruling excluding this exhibit from evidence. While the guardian ad litem has argued here that the record contains no showing of positive advantages to the child by placement with her grandparents, it is clear that the trial court in finding them fit persons made a contrary determination which the evidence supports. The only other issue is whether because the intervention of the Department or for any other reason, the judgment of the court is manifestly demonstrated by the record to be contrary to the best interests and welfare of the infant.

Christina was brought to Illinois by her parents, William and Mary Smith, in 1971 during the time her father was stationed at Chanute air base near Rantoul in Champaign County. In July, 1971, the Department received a report of possible child abuse in respect to Christina from a physician and after an investigation, commenced the juvenile proceedings in 71-J-116 with personal service of summons on the parents. Christina was adjudicated a neglected child and temporary guardianship was placed with the Department where the case was supervised by Mrs. June Henderson, a social worker. Following this order, the Department replaced the child with her parents for a "trial run" to observe whether with Department input, the family could get along. In October, 1971, William was honorably discharged from military service although the record indicates it was actually for abusive use of narcotics. Upon William's discharge, he and his wife indicated to the Department their intentions of returning to California. Believing that the parents were not ready to take the child with them there, the Department obtained a court order in 71-J-116 authorizing them to place Christina with foster parents, which was done.

When Christina's parents returned to California in October leaving Christina behind in Illinois, the grandparents, upon discovering the circumstances, began telephoning and writing to the Department requesting that they be permitted to have custody of their granddaughter in California. Natalie Smith came directly to Illinois for such purpose. After two months of background study, investigation of the home and character of the grandparents, including a personal visit by Mrs. Henderson to their home in California in December, 1971, and after completing arrangements for supervision of the grandparents as a "regular foster home" by California authorities, the Department on January 26, 1972, caused an order to be entered in 71-J-116 giving custody, under its guardianship, to the grandparents who, during the

same month, took Christina to their home in California. The evidence indicates that Natalie Smith at the time of trial was 48 years of age and that George was 43, that both are in good health, that George is a major in the Air Force where he has served continuously for 23 years, and that they are financially comfortable.

The record fully supports the complaint of the grandparents that circumstances became intolerable to them during the period that Christina was in their custody in California from January, 1972, until the following September, and that this was in large measure attributable to the intervention of three separate social agencies (two in California, and the Department) giving conflicting directives in respect to their rights and the rights of the natural parents. It appears that Yolo County, California, authorities had undertaken responsibility for rehabilitating the natural parents with the objective of returning Christina to their custody. A Solano County, California agency assumed supervision of Christina and of her grandparents as foster parents. These two agencies maintained contact with Mrs. Henderson.

The grandparents found the drug-oriented, unemployed, long-haired, freaky-dressed, and publicly intimate life styles of William and Mary and their friends distasteful, and objected on occasions to the circumstances attending their visitations of Christina at the grandparents' home. The grandparents were reprimanded by one of the agencies for having voiced their complaints to William during a visitation, and for complaining that some item of property had disappeared from their home after one such visit. Mrs. Henderson, in explanation, testified that the agencies have no authority to set conditions or dress codes for visitation by natural parents to a foster home. She did not discuss whether the agency ever applied to the courts for imposition of such conditions. One agency, said George Smith, sent a woman who came to our house with a law book and read to Christina her rights, and said she was supposed to do that and that we had no rights to our granddaughter and could not discipline her. A different agency counselled that the grandparents had authority to make the child mind. George Smith testified without contradiction that there were many women from these social agencies coming in and out of his home telling them what they could do and what they couldn't do, and Natalie Smith testified that she was ultimately threatened that if she did not do as told, the agencies would take her granddaughter from her custody. Both grandparents testified they would like to raise their granddaughter free from intervention by social welfare agencies.

In the context of these foregoing circumstances, Mrs. Henderson in August, 1972 made an unannounced visit to the grandparents' home in California and found Natalie Smith in an emotionally "up-tight" condition. She also visited William and Mary and found them full of "hate and vindictiveness" toward the grandparents. She testified that they

inquired of her "How can we ever buck this [*i.e.*, the grandparents'] money?" She visited the California agencies who voiced to her the observation that the natural parents were not progressing and that it seemed unlikely to them that Christina should ever be replaced with them. Having grave doubts that Christina could function in this environment, Mrs. Henderson communicated her concerns to Natalie Smith and related the opinions of the California agencies. *Mrs. Henderson then testified that she counselled Natalie that perhaps the best thing to do would be to bring the child back to Illinois for placement in a neutral foster home where she herself could work with Christina and perhaps work with the natural parents, "because,* said Mrs. Henderson, *"we were still at that time trying to reunite* [her with] *the* [natural] *parents even though I had told the parents and Natalie Smith too, that we were going in for termination if they did not respond."* (Emphasis added.)

Barely one month following Mrs. Henderson's visit to California, Natalie Smith *decided to accept Mrs. Henderson's counsel and invitation* to return the child to Illinois. The California agencies she had been told saw no hope of progress; Mrs. Henderson, on the other hand, had counselled that she would continue efforts at reuniting the family if the child were in a *neutral* foster home in Illinois where she could work with her. *On September 11, 1972, Natalie Smith arrived in Champaign with Christina and contacted Mrs. Henderson about her decision to place the child in neutral foster care. It was her obvious intent that neither to abandon or surrender her interest in the child's well-being but to accept Mrs. Henderson's invitation that this procedure, professionally, was the best hope for reuniting the family.* She visited the foster home placement with Mr. and Mrs. Shafer at Cerro Gordo and assuming it a *neutral* environment with no purpose of adoption, was favorably impressed with Mrs. Shafer.

Thereafter Natalie Smith returned to California, and contacted counsel to commence adoption proceedings in Illinois, keeping close contact with Christina by telephone inquiries and letters to Mrs. Shafer. The grandparents also sold their home in California and transferred to New Jersey to alleviate the tension they had experienced from their proximity to the natural parents. George Smith testified that they moved to New Jersey because the Illinois agency indicated they would have a much better chance of adopting Christina if they got out of California; Mrs. Henderson denied only that she told the senior Smiths "to move to New Jersey." Although, as previously noted, Mrs. Henderson had *specifically testified that she counselled Natalie to bring the child back to Illinois, she later denied in her testimony that Natalie Smith's return to Illinois in September, with Christina, was in accordance with any plan of hers.* And while she had given assurances that the placement would be with a *neutral* foster home it later developed that the Department's placement

was for purpose of concluding adoption with these foster parents. Thus on November 15, 1972, the Department filed in 71-J-116 a supplemental petition alleging that Christina is a neglected child by reason of "abandonment by her custodian," i.e., the grandparents. On December 6, 1972, the grandparents filed their petition for adoption in 72-A-135 *attaching the executed consents of the natural parents who at that time had the sole power and authority to consent to such proceeding.* On December 21, the Department, without notice to the grandparents, called its supplemental petition in 71-J-116 for hearing and obtained an order finding the natural parents unfit and appointing the administrator of the Department as guardian with power to consent to adoption. *The apparent purpose of such an order was to nullify the consents of the natural parents executed and filed in cause 72-A-135.*

By January 10, 1973, George and Natalie Smith learned of the order entered December 21 in 71-J-116 and filed a petition to intervene and for an order vacating the decree of December 21 upon the grounds that the publication notice in respect to the supplemental petition did not pray an order giving the Department power to consent to adoption or to remove that power from the natural parents. After calling their motion for hearing on three separate occasions, it was finally adjudicated on May 30, 1973, and the dispositional order of December 21 was vacated. The Department then filed another supplemental petition in 71-J-116 for power to consent to adoption and for termination of the rights of the natural parents. This motion was heard and allowed on August 31, the docket entry showing that the grandparents were present and "do not object to prayer for termination of rights of Mary and William Smith." The record shows, however, that the State's attorney objected to their appearance at this hearing on the grounds of no standing as parties in interest within the meaning of the Juvenile Court Act (Ill. Rev. Stat., ch. 37, par. 701—20(6)). The matter was continued for dispositional hearing. In the meantime, in cause 72-A-135, the Department obtained an order authorizing it to contact *the New Jersey Division of Youth and Family Services for a background investigation and report on Mr. and Mrs. George Smith.* The Adoption Act provides that in the case of a petition for adoption of a related child, no investigative background study of the petitioners is necessary. The order effected an unnecessary delay. Accordingly, Mrs. Henderson, under the authority of a court order, wrote a letter dated September 6, 1973, to the New Jersey authorities who upon receipt of the same, mailed a copy for filing with the circuit clerk in adoption cause 72-A-135. Mrs. Henderson's letter reads as follows:

"Dear Mr. Eddison:
 *  *  *

Christina has been in and out of foster homes, including her grandparents, since July 1971 when she was brought to our

attention through suspected child abuse report filed by a local hospital. At that time Christina's grandparents lived in Vacaville, California.

After a cursory home and background investigation by the Solano County California Welfare Department, the Department of Children and Family Services permitted Christina to go to California to live with her grandparents in January, 1972. The Solano County Agency agreed to supervise the grandparents home as a foster home and to arrange for visits by Christina's parents on a regularly scheduled basis.

It soon became apparent to the California agency (and to this worker after two visits to California) that Christina was in the midst of an emotional tug-of-war between the grandparents and Christina's father. It was obvious that Christina had become a pawn in the almost sado-masochistic battle between Natalie and her son, William. The grandmother made an automated showpiece of Christina, who on cue would recite her ABC's and end with "I love you" to anyone who said "hello" or stopped to admire her. The George Smiths do not lack the monetary means to support a child. In fact, money is their biggest minus. They feel it can buy anything, including love. They had a $50,000 home in California with $100,000 furnishings. Christina was inundated with toys and clothes. She was given anything she asked for and more, except for firm, loving discipline. In no way could anyone stop the grandparents from buying Christina gifts.

George Smith is a Major in the Air Force. He and Mrs. Smith are in their late forties. They have six sons and as many grandchildren. Their son, William, was given an administrative discharge from the Air Force and was granted amnesty under the drug program in the Air Force. Christina's brother, Shawn, was under protective custody of the State of California prior to his birth, because of threats by the father and of continued drug usage by both parents.[1]

Mrs. Smith's sons have all been disappointments to her and she sees in Christina another chance to succeed as a mother. The Solano County Agency had no luck in trying to get Mrs. Smith to see how she was fulfilling her own needs through Christina or to obtain counseling regarding her problems with her son.

*The Department of Children and Family Services and the Solano County agency mutually agreed that it was in Christina's best interest to place her in a neutral foster home and preferably in*

---

[1] While it seems doubtful that Illinois authorities should assume interest in an unborn child whose mother is a resident of California, according to Mrs. Henderson, the prenatal protective order for Shawn was obtained in California agencies on her advice.

*Illinois.* Before we had the chance to convey our feeling to the George Smiths, the grandmother arrived in Champaign, Illinois in September, 1972 asking the Department to take custody of Christina and place her in foster care here, as she could no longer cope with Christina and Christina's father and she saw only a mental institution for Christina if she remained in the George Smith home.

In October, 1972, Christina's parents requested the court to return Christina to them. We began termination proceedings. In December Christina's parents signed consents to the adoption of Christina by her grandparents. Many months of legal technicalities followed and our court finally terminated the parental rights in August, 1973. Normally, the Department of Children and Family Services would have been granted the power to consent to adoption but the grandparents' lawyer was granted the right to intervene and the dispositional hearing will be held on September 28, 1973.

The grandparents' lawyer does not wish to accept the home evaluations done by the California agency and the Department of Children and Family Services. He has requested a third and a 'neutral' party to the situation, namely the New Jersey Division of Youth and Family Services. We know the Smiths will pass muster with no children around and a fancy new home, and the charm will ooze forth, but unless you see the interaction over a period of time between Christina, her grandparents and other relatives you can't assess the situation with any degree of accuracy. Solano County monitored the home for nine months. For two years, I have been on the front end of letters, telephone calls, and face-to-face confrontations. We both are willing to go to court and testify that Christina will never make it in her grandparents home; that she needs to be placed in a neutral adoptive home; and that no relatives be considered as adoptive parents.

However, we will abide by the court's wishes. We will appreciate it if you can send sort of a home and background assessment to us prior to September 28, 1973. * * *
* * *

Thank you for your cooperation in this matter. A little girl has been kept in limbo for two years. We are all anxious to conclude the legal hassle with a happy ending. However, we do not see the adoption of Christina by her grandparents as that happy ending.
   Sincerely,

(Mrs.) June C. Henderson, ACSW
Child Welfare Worker." (Emphasis added.)

On May 2, 1974, a docket entry was made ordering the consolidation of causes 71-J-116 and 72-A-135 and calling the same for hearing. At the commencement of this hearing, the Department indicated to the court that if its guardian administrator were to be given the power of consent to adoption, he expected to consent to an adoption by the Shafers (*i.e.*, the persons whom Mrs. Henderson consistently labeled "neutral" foster parents), and not by the grandparents. The Shafers then had no petition for adoption pending and were not called as witnesses although all parties admit they are fit persons to adopt.[2] The report of the investigation by the New Jersey agency dated September 21, 1973, addressed to the Illinois Department in response to its inquiry *was never filed or offered by the Department*. A copy of it had been directed to the Smiths, however, and was offered and received in evidence as the Smiths' exhibit *over* hearsay *objections* interposed *by the Department*. It reads as follows:

"Dear Mrs. Henderson:

We are writing in answer to your request for a home evaluation of George and Natalie Smith. On September 17, 1973, Mr. and Mrs. George Smith were visited at home for an interview.

The Smiths live in an upper middle class housing subdivision of about 30 homes in semi-rural surroundings. The house has four bedrooms and is very attractively furnished. The large back yard is fenced and there is more than adequate play space both outside and inside the home. The Vincentown Elementary School is less than two miles from the home.

George Smith is a 42 year old high school graduate who is an Air Force Major at the McGuire Air Force Base. At the present time, he is engaged as an aircraft scheduler and is in good health. Both Mr. and Mrs. Smith are very active in the local Roman Catholic Church and in Base activities. Natalie Smith is 46 year old high school graduate. She is in good health and a housewife.

Both Mr. and Mrs. Smith are very concerned about adopting their granddaughter, Christina Marie Smith, and expressed this concern in terms of frustration, worry and tenseness. They said that they do not understand why there would be any question of their raising their granddaughter, because they have the consent of her parents, they have readily expressed their affection for her, and they have already successfully cared for her on two occasions for an

---

[2] We take notice since the hearing on this appeal that another appeal has since been filed herein as cause No. 12993 from the Circuit Court of Piatt County in which that court, during the pendency of this proceeding, without notice to petitioners in this proceeding or to the Champaign County Circuit Court, entered a decree of adoption of Christina on the petition of Shafers filed May 16, 1974, and with the consent of the guardian administrator of the Department.

extended period of time. Furthermore, Mr. and Mrs. Smith say that they have always had a good marital relationship and that they have always expressed concern for one another.

There is no doubt that Mr. and Mrs. Smith have the monetary means to support a child. Mr. Smith stated that he brings home about $1600.00 a month as well as full medical and other military benefits.

As indicated above, Mr. and Mrs. Smith have cared for their granddaughter on two occasions. First, they cared for her during the first few months of her life until her parents decided to raise her themselves.

After Christina's parents decided that she was too much of a burden for them, George and Natalie Smith took the child to live with them again. They claim they asked the Department of Children and Family Services to place Christina in an Illinois foster home because their lawyer told them that this was the proper thing to do.

Because you indicated an 'almost sado-masochistic battle between Natalie and her son, William', their relationship was probed in detail. Mrs. Smith insisted that she loves her son although she cannot approve of his taking drugs, his abandoning Christina, or his not working. She seemed to have a genuine concern for his welfare. Furthermore, Mrs. Smith said that William shows no interest in the child and that she felt certain that he would not visit his daughter in New Jersey because of the distance from his home. Although Mr. and Mrs. Smith did express some disappointment in their other sons' career choices, they seemed to have concern for them as persons and said that they keep in touch with their whole family on a regular basis. They described some recent visits from their sons and families in some detail.

Because there seems to be a great deal of concern on your part regarding Mrs. Smith's need for counseling, her mental stability was examined. Mrs. Smith definitely gives the impression of being tense, nervous and easily given to tears. Furthermore, she said that she spent a period of time in an orphanage and it appears that she equates her experience there with Christina's experience now. In spite of her difficulties, Mrs. Smith does not seem to be as abnormal as depicted in your letter of September 6, 1973, and her concern for Christina seems genuine. Mr. Smith also seemed a bit nervous, but again this did not appear at all unusual considering that he was speaking of an emotionally charged subject. His concern for Christina also seems very sincere.

In conclusion, it definitely seems that Mr. and Mrs. Smith are eager,

willing and able to care for their granddaughter, Christina. It should be kept in mind; however, that because of the deadline of the court hearing, no outside sources of information regarding the Smiths—relatives, friends, or interested persons in the community—could be obtained.

I hope this evaluation will be helpful in the court's disposition of this young child.

Very truly yours,

(Miss) Virginia Monaghan, MSW
Assistant Supervisor
[State of New Jersey
Department of Institutions and Agencies
Division of Youth and Family Services
50 Rancocas Road
Mt. Holly, New Jersey 08060]"

In holding for the Department the court stated that in the case of an adoption by the grandparents, there would exist a "substantial likelihood in the future that the problems with regard to the natural parents will be much greater if the child is allowed to be adopted by its grandparents" rather than others, that the child apparently has a substantial attachment under local placement and that the question of the grandparents' ages is also relevant since by the time she would be 16 years of age, she will have lived as an only child and Mrs. Smith will be past 60 at a time when it would be difficult to deal with the problems most young people confront at that age. It decided that it was in the best interests of the child to deny the adoption petition. The decision conforms with the philosophy of the Department as expressed by Mrs. Henderson, that *neutral* placements, *i.e.*, in nonrelated homes, are usually more successful and for the best interests of the child, partly because it eliminates confusion "as to who mommy and daddy are."

The legislature, in the provisions of the Adoption Act, while defining the child's best interests as the paramount concern recognized it to be an important interest of a child that his relationships to the persons, places and course of inheritance where Providence has placed him be preserved where possible, and that this interest should be subordinated only when, considering other important interests, a different placement is clearly indicated. (*Jackson v. Russell*, 342 Ill. App. 637, 97 N.E.2d 584 (1951).) Many of the investigative, time and proof requirements of the Adoption Act which are applicable in the case of an adoption by unrelated persons are dispensed with in case of adoptions of a "related child." By provisions of section 1B of "An Act in relation to * * * adoption * * *" (Ill. Rev. Stat., ch. 4, par. 9.1—1B), a "related child" means, *inter alia*, a child subject to adoption where either or both of the adopting parents stand in

the relationship of grandparent to such child. Where the valid consents of the natural parents to an adoption by related persons have been executed and filed in such a proceeding, as here, and petitioners, as here, are fit persons, there should be no occasion whatever for subsequently inquiring in a juvenile proceeding as to the fitness of those natural parents; their residual parental rights were already surrendered to the court by valid consents.

The provisions of the Juvenile Court Act (Ill. Rev. Stat., ch. 37) also reflects a consistent legislative purpose of defining as public policy that the interests of a child in his natural relationships should be preserved wherever practicable. At section 5—7 of the Act, it is provided that if a minor has been adjudged a ward of the court and the parents to be unfit, the court may as the first alternative place the child in the custody of a suitable relative. The provisions for granting to a guardian the power to consent to an adoption is given as a later preference by a subsequent alternative at section 5—9. It is plainly the legislative purpose and policy of this act also to preserve and to strengthen the child's natural family ties whenever possible. It is not designed as a depository of powers by which the Department is licensed to enforce sociological theories of its personnel that neutral placements are ordinarily in the best interests of adoptable infants. Neither was it designed to provide an arsenal of strategic means by which the Department was empowered to frustrate proceedings for adoption by fit grandparents because of its belief that a different possible alternative is better. It is the function of the Department to execute and enforce the public policy defined by the legislature and not to supplant that by substituting its own different policies and theories. The supplemental petition filed by the Department in 71-J-116 on November 15, 1972, to the effect that Christina was a neglected child by reason of "abandonment" by her custodian was manifestly untrue, and ought to have been recognized as untrue by the Department. Abandonment is evidenced only by some conduct which indicates a settled purpose of relinquishing all interest in the child's well being. (See *In re Cech*, 8 Ill. App. 3d 642, 291 N.E.2d 21 (1st Dist., 1972).) Mrs. Henderson, in her own testimony, corroborated that she had invited Natalie Smith to bring the child to Illinois for temporary *neutral* foster care for the contemplated purpose of working with the child *to reunite her with her own family.* Having so testified, her subsequent assertion that the return of the child in September, 1972 was not "according to her plan," and the Department's petition filed in November, 1972, alleging "abandonment by the child's custodian," must be recognized as remarkably inconsistent with the truth, and further corroborative of George Smith's testimony that the social agencies acted and spoke inconsistently, and that their motives were subject to suspicion. Mrs. Henderson did not deny that she was aware of

the grandparents' intention to petition for adoption or that she advised that their removal from California would enhance their prospects. She denied only that she suggested they should move to New Jersey. When the grandparents did move from California and filed a petition to adopt, the Department made repeated efforts to frustrate that proceeding by subsequent efforts to nullify the consents of the natural parents. Mrs. Henderson also effected delays by obtaining court authority in the adoption proceeding for an investigative report of the grandparents in New Jersey, although the adoption act recites that such reports are not required in instances of petitions for adoptions of related children. Her letter to the New Jersey authorities was a conspicuously irresponsible attempt to condition the New Jersey authorities as to the type of response she expected; the New Jersey authorities placed a copy of it in this record, *not the Department*. When the New Jersey report of investigation was favorable to the grandparents, Mrs. Henderson and the Department attempted to suppress it, and objected to petitioners' attempt to offer it to evidence. Having successfully acted to delay, frustrate and prolong the adoption proceedings, the Department then argues that because of attachments that have been permitted to form, during this prolonged interval, between the child and her foster home, it is in the child's best interests not to disrupt that relationship. *This record contains no evidence* that the Shafers had filed any petition for adoption, however, and there was therefore no basis for a conclusion by the Circuit Court of Champaign County that that relationship would not become disrupted in any event. Moreover, during most of the period the child has been with the Shafers, the Shafers have been fully aware of the grandparents desire to adopt and the consents of the natural parents.

In *Madsen v. Chasten*, 7 Ill. App. 3d 21, 286 N.E.2d 505, 506 (4th Dist. 1972), the petitioning husband was 53 years old and the petitioning wife was 58. The unrelated infant had been placed in their home since she was four days old. The investigative report had recommended to the court that because of their ages, petitioners "may not be able to cope with all the problems facing the girl through difficult pre-adolescent and adolescent years," and recommended that the petition be denied. The trial court denied the petition and made the infant a ward of the court and directed an institutional guardian to place the child in a home other than petitioners. The appellate court reversed and remanded with directions to grant the petition for adoption. In so holding, the reviewing court stated that if it were to accept the rule that age itself preclude adoption, *it would nullify a substantial number of adoptions contemplated by the legislature*, which in speaking of instances of adoptions of related children defines related child at section 1 of "An Act in relation to * * * adoption * * *" (Ill. Rev. Stat., ch. 4, par. 9.1—1) as one standing in the relationship to

petitioners as a grandchild. The appellate court cited three other cases where trial courts had been reversed on review for denying adoption petitions on the basis of age only: *William v. Neumann*, 405 S.W.2d 556 (Ky. 1966, where the petitioning husband was 73 years and his wife 53; *In re Duke*, 95 So. 2d 909 (Fla. 1957) where the petitioning husband was 48 and his wife 63 and the child 2½ years; and *In re Adoption of Brown*, 85 So. 2d 617 (Fla. 1956) where the husband was 57 and the wife 53.

*In re Taylor*, 30 Ill. App. 3d 906, 334 N.E.2d 194 (1st Dist. 1975), respondent appealed from an order entered in 1974 finding her an unfit mother of her three infant children on the petition of the Department, and appointing a guardian to consent to their adoption pursuant to provisions of the Juvenile Court Act. The children had been placed in the custody of the Department in 1969, and the finding of unfitness was based on testimony produced by the Department that respondent had since failed to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare. The proof also showed, however, that the Department had refused respondent's requests for information as to the whereabouts of her children, refused her all opportunity to contact the children and refused to correspond with her about their welfare although on occasions she sent money for the children. In reversing the judgment of the circuit court, the appellate court held "We do not believe that the Department should be permitted to prevent a parent from contacting her children and then claim that the parent is unfit solely because she did not do so."

■■ Similarly, it is our judgment here that the Department cannot be permitted by proceedings under the Juvenile Court Act, to stall and frustrate a timely petition by fit grandparents for custody and adoption, and then claim that the child's attachments to foster parents, permitted to be formed during this interval, should be preserved, and that the best interests of the infant are better served by refraining from disturbing the relationship it has created. If we were to accept that argument as valid it would provide a rule whereby even a child snatcher who successfully concealed the identity of the infant for some long interval of six years could, with more or at least equal validity, establish custodial rights by proof that excellent loving care had been provided and that it would be disruptive of attachments that had been formed and contrary to the best interests of the infant to break them. If, as we believe the record shows here, any attachments that have grown were seeded and nurtured by the wrongful exercise of State powers, no appropriate restraints to protect individuals from official abuse are possible unless the court will inevitably act to correct such wrongs whenever they appear. It is an important responsibility of the courts, even where such duty is an unhappy one, to preclude public agencies from misusing powers granted by the legislature

for the purpose of defeating legislative intent. Fortunately, Christina is about to enter schooling and hopefully is at an age where adjustments to change, with careful guidance (and perhaps professional help), can yet be successfully effected. We feel considerable sympathy for all parties affected by this decision but conclude, nonetheless, as follows:

1. That the finding as to the fitness of the petitioning grandparents is fully supported by the evidence and the law and was correct.

2. That, in the adoption proceeding, the consents of both natural parents were filed in proper form at a time when the right to consent was vested by law in the natural parents.

3. That the trial court erred in proceeding on the Department's subsequent petition to adjudicate the natural parents unfit and to vest the power to consent to adoption in the Department without first considering the pending adoption proceeding.

4. That the finding of the circuit court that the best interests of the child required that the petition of her grandparents, who were correctly found to be fit persons to adopt, should nonetheless be denied because of attachments that formed during the period the Department interfered with such proceedings is contrary to the manifest weight of the evidence and to the law; and

5. That the Department's abuse of authority granted by the legislature must be corrected.

Accordingly, the judgment of the circuit court is reversed and the cause is remanded with directions to enter an order granting the petition to adopt and to make such other orders in aid thereof, as shall forthwith effect the transfer of custody in accordance with the directives of this opinion.

Reversed and remanded.

ALLOY, P. J., and STENGEL, J., concur.