729 N.E.2d 553 (2000)
313 Ill. App.3d 301
246 Ill.Dec. 180
In re ADOPTION OF C.D., a Minor (Bonnie S.P., n/k/a Bonnie S.G., and F. Dean G., Petitioners-Appellants,
v.
Phillip P. and Melissa P., Respondents-Appellees).
No. 4-99-0641.
Appellate Court of Illinois, Fourth District.
Argued February 23, 2000.
Decided May 15, 2000.
*556 Brenda H. Simkins (argued), Janis M. Sommers, Hartweg, Mueller, Turner & Wood, P.C., Bloomington, for Bonnie S. Godwin.
Don C. Hammer (argued), Hayes, Hammer, Miles, Cox & Ginzkey, Bloomington, for Phillip Personnette.
Jon E. McPhee, Assistant Public Defender, Guardian Ad Litem, Bloomington, for C.D.
Presiding Justice COOK delivered the opinion of the court:
Bonnie G. and Dean G. appeal an order denying their petition to adopt their granddaughter, C.D. They allege numerous errors committed by the circuit court in an attempt to overturn an order finding that it was in C.D.'s best interests to be adopted by her foster parents, Phillip P. and Melissa P. We affirm the circuit court's judgment.

I. BACKGROUND
Tina D. gave birth to C.D. on January 29, 1993, in McLean County, Illinois. Tina D. subjected C.D. to physical abuse and allegations were made that Scott D., Tina D.'s brother, sexually abused C.D. In October 1996, the McLean County juvenile court found C.D. to be an abused child and placed her in the care of the Illinois Department of Children and Family Services (DCFS). On April 10, 1997, the trial judge made C.D. a ward of the court.
C.D. was placed in foster care with Marie Y. DCFS developed a service plan to assist and counsel Tina D. so that she and C.D. could ultimately be reunited. A DCFS caseworker contacted Bonnie G., Tina D.'s mother, to determine if she would be willing to provide a temporary home for C.D. Bonnie agreed to take C.D. into her home. C.D. was accustomed to spending time with Bonnie, having lived with her during the summer of 1994, and enjoying other extended visits in 1995 and 1996. Bonnie participated in a home study that concluded she was a suitable placement for C.D. However, DCFS chose not to place C.D. with her grandmother because Bonnie and Dean lived in the State of Virginia. Moving C.D. to Virginia would prevent visitation with Tina D. and impair DCFS' goal of reuniting C.D. and her mother.
C.D. remained in foster care with Marie Y. for approximately eight months. Marie Y. was experiencing personal problems unrelated to C.D., so on June 8, 1997, C.D. was moved to Melissa and Phillip P.'s foster home (foster parents).
Through counseling and other assistance, Tina D. made progress toward achieving custody of C.D. However, without discussion or notification to DCFS, Tina D. executed a final and irrevocable consent to adoption on January 15, 1998, purporting to consent to Bonnie's adoption of C.D. Robin Cashen, DCFS court monitor, testified that at the time Tina D. signed the consent she "had basically completed her client service plan, and it was a matter of working [C.D.] back into the [Tina D.'s] home."
On January 22, 1998, Bonnie filed her petition to adopt a related child. Later, the petition was amended to join Bonnie's husband, Dean, as a party to the petition (Bonnie and Dean collectively referred to as "grandparents"). When DCFS was notified of the consent and grandparents' *557 petition in late February 1998, it requested an adoptive home study of the grandparents through the Interstate Compact on Placement of Children Act (Act) (45 ILCS 15/0.01 et seq. (West 1998)). In March 1998, caseworkers from Catholic Social Services (CSS) and the Children's Advocacy Center of McLean County (court-appointed special advocate (CASA) program) recommended placing C.D. with the grandparents. At a hearing on April 14, 1998, the foster parents attended and informed the circuit court that they would adopt C.D. if the grandparents' petition for adoption did not go through for some reason.
By the end of August 1998, the adoptive home study had not yet been completed by the State of Virginia because Bonnie and Dean were living together and were unmarried. Dean had not yet divorced his third wife, and the State of Virginia would not complete the home study because of the living arrangement.
As the months passed, the foster parents became more assertive with their interest in adopting C.D. On August 31, 1998, the foster parents filed their petition to intervene and petition for adoption in the grandparents' adoption proceeding. The foster parents alleged that their petition was entitled to the "foster-parent preference" and should be given first consideration pursuant to sections 15.1(a) and (b) of the Adoption Act (750 ILCS 50/15.1(a), (b) (West 1998)). The sections give foster parents who have had custody for more than one year a preference in the adoption proceeding.
At a hearing in September 1998, the circuit court found that both petitions to adopt were premature because the parental rights of C.D.'s parents had not yet been terminated. The court allowed the petitions to remain on file and continued them generally. The parental rights of C.D.'s birth father were terminated on September 29, 1998. On October 20, 1998, the State moved to terminate Tina D.'s parental rights because she "failed to make reasonable progress toward the return of [C.D.]." The motion also requested that the court appoint DCFS guardian "with the power to consent to [C.D.'s] adoption." The State filed a supplemental petition for adjudication of wardship on December 22, 1998, stating that Tina D. wished to be relieved of her parental duties. Tina D. agreed to the appointment of DCFS as guardian, but did not agree to DCFS being given power to consent to adoption until the court heard evidence from the grandparents and foster parents relating to their competing petitions to adopt C.D.
At the hearing on December 22, 1998, the court admonished Tina D. that she was relinquishing her parental rights and that the court alone would determine C.D.'s best interests based on the competing petitions to adopt. The court specifically informed Tina D. that it may not find that placement with the grandparents was in C.D.'s best interests. After extensive explanation and discussion with Tina D., the circuit court accepted her waiver of parental rights. Tina D.'s parental rights were terminated by court order. The court also ordered an investigation report of the grandparents and the foster parents pursuant to section 6 of the Adoption Act (750 ILCS 50/6 (West 1998)) and set the matter for hearing.
The circuit court held four days of hearings to determine which family would provide the best adoptive home for C.D. The court heard testimony from each of the prospective adoptive parents. Additionally, numerous caseworkers and counselors testified at trial. The caseworkers and counselors overwhelmingly agreed that while the grandparents were an acceptable placement for C.D., it would be in C.D.'s best interest to be adopted by the foster parents.
DCFS caseworker Susan Allison suggested placement with the foster parents because of her concern that any exposure to Scott D., who was accused of sexually abusing C.D., would be harmful.
*558 Robin Cashen initially testified that she believed Bonnie would be a "good placement" for C.D. Cashen went on to state, however, that she believed it would be in C.D.'s best interest to be adopted by the foster parents because:
"She has been there since June of 1997. From the reports that I have read, she is very bonded to [the foster parents] as mom and dad. She is bonded to the other children in the home. She has been in the home consistently and knows these people as her family, and [their] extended family as her family."
Chris Newman, a CSS caseworker, testified that when she first became aware of the direct consent signed by Tina D., she believed that C.D.'s placement with Bonnie would be in her best interest. By August 1998, however, her opinion had changed and she favored C.D. staying with the foster parents. She changed her mind because of the delay in obtaining a home study from Virginia, C.D.'s limited contact with Bonnie and Dean, and the fact that C.D. had developed a stronger bond with the foster parents.
Jennifer Aranda, a clinical professional counselor, testified that it was in C.D.'s best interest to stay with the foster parents. However, she had no opinion regarding the grandparents' ability to care for C.D. because she had never spoken to them or observed them with C.D. Aranda expressed concern that any move would create a risk to C.D. because C.D. needed security and structure. She feared that further moves would increase the risk of C.D. "acting out."
Carolyn Walker, a CASA caseworker, understood that C.D. was not placed with her grandparents originally because of the delays related to the home studies. Despite the delays, Walker believed that adoption by the grandparents was in C.D.'s best interests.
Steve Bryan, a DCFS adoption specialist, reviewed the interstate home studies of the grandparents, met with the foster parents, met with C.D. six or seven times, and consulted C.D.'s teacher and counselor. His opinion was based on his observations, his opinions, the Adoption Act, and DCFS' rules and procedures. Bryan stated that he felt that both couples were appropriate to adopt C.D. and that both had a positive relationship with C.D. Bryan testified that C.D. recognizes the foster parents as mom and dad and the foster parents' daughter as her sister. He felt it was important to preserve these family ties for C.D.'s stability and best interest. He recommended that C.D. maintain her current ties with her school, her counselor, and her friends. He ultimately recommended that C.D. stay with the foster parents.

II. ANALYSIS
The grandparents' first argument on appeal is that the circuit court's order granting the foster parents' adoption petition was not in C.D.'s best interests.

A. The Trial Court's Decision Granting the Foster Parents' Petition for Adoption was Within Its Discretion and Not Against the Manifest Weight of the Evidence
The Adoption Act specifies that the "best interests and welfare of the person to be adopted shall be of paramount consideration in the construction and interpretation of this Act." 750 ILCS 50/20a (West 1998). After hearing extensive evidence from the grandparents and the foster parents in support of their respective adoption petitions, the court determined that it was in C.D.'s best interests to grant the foster parents' petition. On appeal, we will not overturn an adoption judgment involving the best interest of a child unless the circuit court clearly abused its discretion and the judgment was against the manifest weight of the evidence. In re Adoption of Scheidt, 89 Ill.App.3d 92, 99, 44 Ill.Dec. 432, 411 N.E.2d 554, 560 (1980).
The grandparents make numerous factual arguments as to why the circuit court's decision was in error. These arguments can essentially be reduced to two: (1) they *559 are C.D.'s blood relatives and currently have custody of A.D., C.D.'s younger half-brother, and (2) they are financially more stable than the foster parents. The grandparents argue that these factors establish that it is in C.D.'s best interests to be placed with them and not the foster parents. The circuit court was required to consider several statutory factors in reaching its decision in this case. Section 15.1(c) of the Adoption Act states that "the court shall consider all relevant factors including[,] but not limited to[,] the factors in subsection (b)" (750 ILCS 50/15.1(c) (West 1998)), which include:
"(1) the wishes of the child;
(2) the interaction and interrelationship of the child with the applicant to adopt the child;
(3) the child's need for stability and continuity of relationship with parent figures;
(4) the wishes of the child's parent as expressed in writing prior to that parent's execution of a consent or surrender for adoption;
(5) the child's adjustment to his present home, school[,] and community;
(6) the mental and physical health of all individuals involved;
(7) the family ties between the child and the applicant to adopt the child and the value of preserving family ties between the child and the child's relatives, including siblings;
(8) the background, age[,] and living arrangements of the applicant to adopt the child;
(9) the criminal background check report presented to the court as part of the investigation required under [s]ection 6 of this Act." 750 ILCS 50/15.1(b) (West 1998).
Upon review of the record, it is clear that the circuit court considered the statutory factors, evidence presented, and the witness testimony in reaching its ruling in favor of the foster parents. The court heard four days of testimony from the parties, counselors, and various caseworkers. The circuit court was in the best position to assess the credibility of witnesses and the evidence. See People ex rel. Bukovic v. Smith, 98 Ill.App.3d 144, 153, 53 Ill.Dec. 498, 423 N.E.2d 1302, 1309 (1981).
The circuit court noted that it was a difficult decision to make since both families would provide a good home for C.D. The court acknowledged the importance of C.D. maintaining relations with blood relatives and her siblings. However, the court also recognized that Melissa P. was a "stay-at-home mom" and had done an excellent job nurturing C.D. for the previous two years. In reaching its decision in favor of the foster parents, the court noted that even though the foster parents may not possess material things comparable to the grandparents, their home provided things that "money can't buy." After our review of the record, we find that the circuit court's decision to give custody to the foster parents was within its discretion and not against the manifest weight of the evidence.

B. The Trial Court Did Not Commit Reversible Error by its Application of Section 15.1(b) of the Adoption Act
The grandparents next argue that the circuit court's application of Adoption Act section 15.1(b) circumvents Illinois public policy favoring relatives in adoption proceedings. They assert that the circuit court's interpretation of section 15.1(b) negates this court's decision in In re Adoption of Smith, 38 Ill.App.3d 217, 347 N.E.2d 292 (1976). In Smith, we reversed a circuit court order denying the grandparents' petition to adopt. In Smith, we stated:
"The legislature, in the provisions of the Adoption Act, while defining the child's best interests as the paramount concern[,] recognized it to be an important interest of a child that his relationships to the persons, places[,] and course of inheritance where Providence has placed him be preserved where possible, *560 and that this interest should be subordinated only when, considering other important interests, a different placement is clearly indicated." Smith, 38 Ill. App.3d at 227, 347 N.E.2d at 300-01.
Then, as now, we encourage the preservation of family ties in adoption cases. However, preservation of family ties is not the only consideration. Almost six years after Smith, our legislature added section 15.1 to the Adoption Act, recognizing additional factors and considerations that should be taken into account when reviewing petitions to adopt. Pub. Act 82-437, § 2, eff. January 1, 1982 (1981 Ill. Laws 2274, 2286).
Section 15.1 also established an adoption "preference" for foster parents who had custody of the child for one year or more. In Johnson v. Burnett, 182 Ill.App.3d 574, 131 Ill.Dec. 517, 538 N.E.2d 892 (1989), the court emphasized the temporary nature of the foster family relationship, but also discussed the purposes of the foster-parent preference, stating:
"It is understandable that, after a period of years, a bonding within the foster family would occur which would make separation difficult. * * * It is this bonding which is also the reason the legislature has required that foster parents, who have had custody of their charge for over 12 months, be given first consideration in adopting that child * * *." Johnson, 182 Ill.App.3d at 582, 131 Ill.Dec. 517, 538 N.E.2d at 898.
Preserving family ties between the child and the child's relatives and siblings is important, but merely one of the several factors to be considered under the Adoption Act. No single factor is assigned greater value than any other; and the court is to consider all relevant factors in making an adoption determination. In re M.M., 156 Ill.2d 53, 69-70, 189 Ill.Dec. 1, 619 N.E.2d 702, 712 (1993).
The grandparents also argue that the circuit court's comments demonstrate that it applied the foster-parent preference but did not apply the individual factors of section 15.1(b). In its oral ruling, the court discussed how the case had progressed to the point of decision and how section 15.1(b) applied to the case even though the guardian (DCFS) did not have authority to consent to the adoption. The court stated:
"I think this section [(b)] was written with the knowledge that this type of situation [where the guardian did not have authority to consent to the adoption] is a rarity and in almost every case licensed foster parents who are adopting are going to be adopting from some agency, probably DCFS, who has the power to consent to adoption * * * and in [s]ubsection (c) it is made clear that the final determination of the propriety of the adoption shall be within the sole discretion of the court[,] which shall base its decision on the welfare and best interest of the child.
In arriving at this decision, the court shall consider all relevant factors[,] including but not limited to the factors in subsection (b)[,] which has the nine factors alluded to by various parties and it also contains the preference to be given to foster parents who have had the child for more than a year.
The court believes this section [(b)] has applicability in this case, that the court is to apply that, and that the Smith decision, I believe, is a decision that predates this section[,] which was not adopted until I think the early '80's[,] and I believe this section was added to the law to take account of situations in which children have become bonded into foster homes clearly regardless of what the individual factors are[,] regardless of the preference issue and regardless of the consent of the guardian, if there is a guardian with the power to consent, the court must make this decision based on the best interest of the child as it views it." (Emphasis added.)
The grandparents focus on the emphasized language to support their claim that the *561 circuit court ignored the other factors in section 15.1(b). This takes the court's comments out of context. When the entire statement is read, it is evident that the court was merely emphasizing that, regardless of the preferences or individual factors, the paramount concern is the child's best interests.
Only after consideration of all the testimony and evidence presented, as well as the factors set forth in the Adoption Act, did the court make its decision to deny the grandparents' petition and to grant the foster parents' petition. The circuit court appropriately applied section 15.1(b) of the Adoption Act to this case.

C. Equal-Protection and Due-Process Rights of Out-of-State Relatives Pursuing Adoption Are Not Denied by Applying Section 15.1 or DCFS Policies
The grandparents also claim that they were "intentionally and arbitrarily discriminated against by [DCFS], and by the trial court in its arbitrary (and erroneous) application of certain sections of [section 15.1(b) ]." They assert that their constitutional rights to equal protection and due process were violated.
The starting point for any due-process or equal-protection analysis is the selection of the proper test to be applied when reviewing the alleged constitutional violation. In re I.D., 205 Ill.App.3d 543, 548-49, 151 Ill.Dec. 94, 563 N.E.2d 1200, 1204 (1990). The grandparents argue that they have a fundamental right to maintain their family relations with C.D. and that this justifies application of the strict-scrutiny test.
Under strict-scrutiny analysis, legislation that significantly interferes with the exercise of a fundamental right will be upheld only if necessary to promote a compelling state interest and narrowly tailored to effectuate that state purpose. Gersch v. Department of Professional Regulation, 308 Ill.App.3d 649, 655, 242 Ill.Dec. 51, 720 N.E.2d 672, 678 (1999). While courts have subjected legislation to strict-scrutiny review because of interference with family relationships, we are not aware of, nor have the parties cited, any cases that recognize grandparent-grandchild relations as a constitutionally protected fundamental right. Therefore, the strict-scrutiny test would be inappropriate.
As a fall-back position, the grandparents propose that we apply the rational-basis test. Support does exist for application of the rational-basis test when reviewing constitutional challenges to provisions of the Adoption Act. In Regenold v. Baby Fold, Inc., 68 Ill.2d 419, 437-38, 12 Ill.Dec. 151, 369 N.E.2d 858, 866 (1977), our supreme court, in addressing a constitutional challenge to parts of the Adoption Act, observed that it was necessary to balance the concern of the state, as parens patriae, with the right of a parent to custody of her child. The court noted that parental rights are protected by the constitution. Parental rights may not be interfered with, under the guise of protecting the public interest, by legislative action that is arbitrary or without reasonable relation to some purpose within the competency of the state to enact. Regenold, 68 Ill.2d at 438, 12 Ill.Dec. 151, 369 N.E.2d at 866. The Regenold court applied the rational-basis test.
The rational-basis test provides that a statute or rule will be upheld in the face of an equal-protection challenge as long as the distinctions drawn bear some rational relationship to a legitimate state end. When applied to a due-process challenge, the statute will be upheld if it bears a rational relation to a legitimate state purpose and is neither arbitrary nor discriminatory. I.D., 205 Ill.App.3d at 549, 151 Ill.Dec. 94, 563 N.E.2d at 1204.

1. Equal Protection

In support of the equal-protection argument, the grandparents argue that DCFS' policy of requiring home-study investigations of out-of-state relatives seeking *562 to adopt created an undue delay in the adoption process that allowed C.D. to stay with the foster parents long enough for them to qualify for the foster-parent preference. The circuit court also ordered a background investigation and it appears that the grandparents are also claiming this was improper. In addition, the grandparents argue that the foster-parent preference is an unjustified classification that infringes upon their family relationships. They claim that this preference makes it "impossible for out-of-state relatives, such as grandparents, to adopt a child * * * who has been in the same foster home for more than one year."
We disagree with the grandparents' equal-protection claims. Initially, we note that the home study is required by the Act (45 ILCS 15/0.01 et seq. (West 1998)). The Act states in article 111(d):
"The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child." 45 ILCS 15/1, art. III(d) (West 1998).
No exemption for relatives appears in the Act. The home-study requirement is not in any way discriminatory. It merely serves the intent of ensuring appropriate placement for the child. As for the court's order requiring an investigation report of the grandparents, the Adoption Act specifically grants the trial court with discretion to order an investigation of relatives seeking to adopt. 750 ILCS 50/6(D) (West 1998). We see nothing in the record to support any claim that the investigation was ordered or performed with the intent to frustrate the grandparents' petition for adoption. In fact, the resulting delay between the time their petition was filed and the actual hearing on the petition of which the grandparents complain was brought about partly by their own actions, not the circuit court's order or DCFS' policy.
In February 1998, DCFS was informed that Tina D. had signed a consent for her mother to adopt C.D. At that time, DCFS requested an interstate adoptive home study. Virginia's interstate department notified Robin Cashen that it was unable to complete an adoptive home study because Dean was cohabitating with Bonnie while he was still married to someone else. The State of Virginia did not complete its home study until October 22, 1998, when it learned that Dean had finally obtained a divorce from his third wife.
The grandparents knew that their living arrangement was preventing the home study from being completed in March 1998. They had the ability to correct the situation that prevented the home study from proceeding, but they did not do so. In their reply brief, the grandparents note that Dean's divorce from his former wife was delayed for reasons beyond his control. While this may be true, the fact remains that their choice of living arrangement contributed to the delay in obtaining the required home study. In any event, the home study and court-ordered investigation are rationally related to the legitimate goal of finding a stable adoptive home for children in need.
We next turn to a review of the grandparents' claim that the foster-parent preference is unconstitutional and violative of the equal-protection rights of out-of-state relatives. The state, as parens patriae, has a right and duty, as well as authority, to legislate for the protection and welfare of children within its jurisdiction. I.D., 205 Ill.App.3d at 549, 151 Ill. Dec. 94, 563 N.E.2d at 1204. Our legislature has done so by enacting the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 et seq. (West 1998)) and the Adoption Act (750 ILCS 50/0.01 et seq. (West 1998)). These acts have created a comprehensive scheme to ensure that children receive proper care and training. They authorize removal of the children from the home if necessary. I.D., 205 Ill.App.3d at 549, 151 Ill.Dec. 94, 563 *563 N.E.2d at 1204. The ultimate goal, however, is to reunite children with their parents. When reunification of the parent and child cannot be accomplished, the acts strive to place the children in a permanent, stable adoptive home. I.D., 205 Ill.App.3d at 549, 151 Ill.Dec. 94, 563 N.E.2d at 1204-05. We find that the foster-parent preference in section 15.1 of the Adoption Act is rationally related to the legitimate goal of providing a stable adoptive home for children in need.

2. Due Process

For purposes of their due-process argument, the grandparents argue that the Juvenile Court Act has created a liberty interest, guaranteeing their right to family relationships, and that the circuit court's decision and the DCFS' policies frustrate that interest. State statutes may create liberty interests that are entitled to the protections of the fourteenth amendment and the due-process clause. See Wolff v. McDonnell, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935, 951 (1974). However, for a statute to grant a person a protected liberty interest, the person must have a legitimate claim of entitlement to the liberty interest. Greenholtz v. Inmates of the Nebraska Penal & Correctional Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103-04, 60 L.Ed.2d 668, 675 (1979), quoting Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972).
We agree that the primary purpose of the Juvenile Court Act is to strengthen family ties whenever possible and to reunify the original family. In re H.C., 305 Ill.App.3d 869, 877, 239 Ill.Dec. 253, 713 N.E.2d 784, 790 (1999). The grandparents argue that this purpose applies not only to the parent-child relationship, but to the grandparent-grandchild relationship as well. We disagree. Parents have a liberty interest in bearing and raising their children. People v. R.G., 131 Ill.2d 328, 342, 137 Ill.Dec. 588, 546 N.E.2d 533, 540 (1989). Parents have a fundamental right to control the family. See R.G., 131 Ill.2d at 343, 137 Ill.Dec. 588, 546 N.E.2d at 541. However, that fundamental right does not extend to grandparents. Further, the Juvenile Court Act does not create a liberty interest that applies to grandparents. The overriding issue in adoption proceedings is the best interests of the child. The fact that DCFS and the circuit court favored the foster parents over the grandparents does not constitute a violation of the grandparents' due-process rights.

D. No Reversible Error in Denying Admission of Grandparents' Exhibit Nos. 1 through 5
The grandparents next claim that they were prejudiced by the circuit court's refusal to admit their exhibit Nos. 1 through 5 into evidence. The grandparents maintain that two home studies and three DCFS client service plans should have been admitted into evidence under the "business records" exception to the hearsay rule (145 Ill.2d R. 236(a)). The circuit court excluded the exhibits on the ground that they were violative of section 6(C) of the Adoption Act. 750 ILCS 50/6(C) (West 1998). That section relates to adoption investigation reports and states that "[i]n no event shall any facts set forth in the report be considered at the hearing of the proceeding, unless established by competent evidence." 750 ILCS 50/6(C) (West 1998).
Exhibit No. 1 was a foster-care home study performed by the Virginia Department of Social Services in December 1996. At that time, DCFS was considering placing C.D. with the grandparents for foster-care placement while Tina D. received counseling and therapy. The report provides an overview of the grandparents' personal lives, concluding that they would be suitable for foster-care placement. The grandparents claim that excluding this exhibit prejudiced them because it was evidence *564 related to their suitability as appropriate adoptive parents.
Exhibit Nos. 2, 3, and 4 are DCFS client service plans for Tina D. and C.D. from October 1996, April 1997, and October 1998. The grandparents assert that these exhibits demonstrate that after Tina D. surrendered her parental rights, DCFS intended to place C.D. with them until the point in time when the foster parents filed their adoption petition.
We agree with the grandparents that exhibit Nos. 1 through 4 would not fall within the "investigative report" provisions of section 6(C). 750 ILCS 50/6(C) (West 1998). However, we decline to determine their admissibility under the business records exception to the hearsay rule because we find that the exclusion of these exhibits, even if improper, was harmless. These exhibits contained information of which the court was already aware through other evidence presented. Admitting these exhibits would have merely been cumulative. See Archer Daniels Midland Co. v. Industrial Comm'n, 174 Ill.App.3d 918, 926, 124 Ill.Dec. 417, 529 N.E.2d 237, 243 (1988) (since information in report would have been cumulative, any possible error in excluding the report would have been harmless), rev'd in other part, 138 Ill.2d 107, 149 Ill.Dec. 253, 561 N.E.2d 623 (1990). Therefore, the circuit court's exclusion of these exhibits was not error.
Exhibit No. 5 was the investigation report of DCFS' adoption specialist, Steve Bryan. Section 6(C) of the Adoption Act specifically states that these reports are to remain confidential. The report is to be withheld from the parties unless the report contains adverse findings toward a party, in which case the court will inform the parties of the portions containing the adverse findings. 750 ILCS 50/6(C) (West 1998). The report did not contain findings adverse to either party and the court did not make the report available to the parties. Apparently, however, DCFS did make copies of the report available to counsel for the parties. The grandparents claim that DCFS was in error for making the report available to them.
Assuming DCFS did make the report available, it would be contrary to the statute. However, we fail to see any harm or prejudicial effect to the grandparents by virtue of the disclosure. We dismiss the grandparents' claim of error relating to exhibit No. 5 as harmless.
E. The Circuit Court Was Correct in Finding that Tina D.'s Direct Consent To Adopt by Her Mother Was Invalid
The grandparents' final argument relates to the validity of Tina D.'s consent to adopt. On January 15, 1998, Tina D. executed a final and irrevocable consent to adoption of C.D. in favor of her mother, Bonnie. We have previously held that a parent whose parental rights are about to be terminated may not execute consents in favor of relatives in an attempt to control the placement of her child or to prevent the court from choosing the placement that is in the best interests of the child. In re Adoption of L.R.B., 278 Ill.App.3d 1091, 1094, 215 Ill.Dec. 950, 664 N.E.2d 347, 348-49 (1996). Here, Tina D. executed her consent to adopt at a time when she was about to regain custody of C.D. The circuit court ultimately ruled that the consent was improper under the Adoption Act.
Under section 10(O)(1) of the Adoption Act, a parent may, with approval of DCFS, execute a consent to adoption by a specified person:
"(a) in whose physical custody the child has resided for at least one year; or
(b) in whose physical custody at least one sibling of the child who is the subject of this consent has resided for at least one year, and the child who is the subject of this consent is currently residing in this foster home; or
(c) in whose physical custody a child under one year of age has resided for at least [three] months." 750 ILCS 50/10(O)(1) (West 1998).
*565 Section (a) is inapplicable because C.D. was never in Bonnie's physical custody. Section (b) is inapplicable because, although Bonnie eventually had custody of C.D.'s half-brother, A.G., Bonnie did not have that custody at the time the consent was signed. At the time that the consent was invalidated, Bonnie had had custody of A.G. for only six months. C.D. had visited Bonnie in Virginia after being placed in foster care, but C.D. was not residing with Bonnie at the time that the consent was signed or at the time it was invalidated. Section (c) does not apply because C.D. was not "a child under one year of age" at any pertinent time and never resided with Bonnie for three months. Bonnie argues that "a child" as referred to in section (c) means the sibling, A.G., and that A.G. had been living with her for approximately six months at the time the consent was invalidated. The circuit court rejected that argument, finding that the words "a child" in section (c) refer to the child who is the subject of the consent. We agree. The consent to adopt in favor of Bonnie does not qualify under section (c). Therefore, the circuit court did not err when it found Tina D.'s consent to adopt invalid.

III. CONCLUSION
For the reasons set forth, we affirm the ruling of the circuit court granting the adoption petition in favor of the foster parents and against the grandparents.
Affirmed.
STEIGMANN and McCULLOUGH, JJ., concur.