*In re* OTTO BREDENDICK *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* OTTO BREDENDICK *et al.*, Respondents-Appellants.)

First District (5th Division)    No. 78-1136

Opinion filed July 27, 1979.

Ralph Ruebner and Gary Jay Ravitz, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Rimas F. Cernius, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Sharon Bredendick[1] appeals the trial court's appointment of a guardian with the power to consent to the adoption of her two minor children, Otto, Jr., and Karen, and contends that the State failed to show her unfitness as a mother by clear and convincing evidence.

It appears that Otto, Jr. (born July 11, 1967), came into care of the Department of Children and Family Services (DCFS) in 1972, when his mother was hospitalized and his father unable to care for him because of the demands of his employment. During this period of placement, the boy was visited by Otto, Sr., on an undesignated number of occasions, and he was eventually returned to the care of his parents. Then, on August 31, 1973, Sharon was discovered lost in the downtown area of Chicago in the company of Otto, Jr., and Karen (born August 30, 1972). Sharon was placed in the Reed Zone Center for psychiatric care, and petitions were filed for the adjudication of wardship for Otto, Jr., and Karen, with the trial court finding that there was probable cause to believe that Otto, Jr., and Karen were neglected and in immediate and urgent need of a temporary custodian or guardian for their care and protection. In light thereof, the children were placed in the temporary custody of DCFS until October 1, 1973, when further proceedings were to be had. No transcripts of the proceedings on that date or of the subsequent proceedings of February 8, 1974, were included in the record, but it does appear that on the latter date both children were found to be neglected and were placed in the guardianship of DCFS until they reached 21 years of age or further order of court.

In October 1973, the children were placed and have continuously remained in the licensed foster home of Sharon Sherrick, who (in March 1975) at the request of DCFS wrote to Sharon Bredendick but received no response.

In June 1975, Doris Tankesley, a social worker for DCFS, was assigned to the Bredendick case. Upon reviewing department records, she made determinations that the parents required greater rehabilitation and that it was questionable whether the children would ever be returned to them. In attempting to contact the parents, she sought out Sharon at McFarland Zone Center but was informed that she had left that institution in June 1975, against its recommendation. Doris wrote six or seven letters to the hospital and to the address of Sharon's parents, but received no response.

On February 9, 1976, Doris received a call from Otto, Sr., and a meeting was arranged at a DCFS office on February 13. At that meeting,

---

[1] Initially, Otto Bredendick, Sr., had joined Sharon in appealing such order; however, he passed away prior to oral argument before this court and is no longer a party.

Otto, Sr., at first stated that it was Sharon's actions which caused the children to come into care, but later he admitted that his own behavior had contributed to their placement. Otto, Sr., told Doris that they had returned to Chicago from Sharon's parents' home in Springfield in June 1975, but that he had hesitated in contacting DCFS until he was satisfied that Sharon would not suffer a relapse. Doris was shown a letter from Dr. Firling, stating that in his opinion Sharon was ready for the return of the children. During the course of this meeting, Sharon repeatedly asked whether she would be seeing the children that day and, on each occasion, Doris replied negatively. Otto, Sr., also informed Doris that he had been working on a daily-pay basis for some time, and it appears that when Doris ended the meeting she said that she would contact Dr. Firling; that she would investigate the possibility of setting up an undesignated program of counseling for the parents; that she recommended that Otto, Sr., should stabilize his employment situation; that if at some future time return of the children appeared imminent, the parents would have to secure a larger apartment; and that as progress was made in these areas, DCFS would arrange visits with the children.

Doris next met with the parents on May 12, 1976, in their apartment. As an indication of what the parents would encounter upon return of the children, she informed them that Otto, Jr., was having problems in school and was experiencing emotional difficulties, and that Karen would present a problem as she had grown very attached to her foster parents. The Bredendicks responded by assuring Doris that they could handle these situations, which they did not view as real problems. Doris was informed by Otto, Sr., that he was then on disability, and both parents were told that she was transferring their case to a DCFS worker who serviced the area where they resided (the Bredendicks had changed residences subsequent to their initial visit with Doris).

Julie Hanson, a DCFS social worker, was assigned to the Bredendick case in March 1977, and she testified that upon reviewing department records she decided to contact the parents to ascertain Sharon's capability in light of her history of psychiatric hospitalization and to determine whether Otto, Sr., was abstaining from alcohol. On May 4, she telephoned the Bredendicks and arranged for a meeting at their home two days later. On arriving at their apartment building in the company of her supervisor, Julie observed that Otto, Sr., was associating with a group of men on the front steps; that there were beer cans on such steps; that the building was rundown, with several broken windows; and that the Bredendick apartment was dingy and messy. She inquired of the Bredendicks why, after failing to contact Karen or Otto, Jr., for so long a time, they were now asking for the return of the children. Otto, Sr., replied that he felt it would be good for his wife to have the care of the children, as she needed

something to do. Julie and her supervisor then suggested the special needs of the children and the children's lack of contact with the Bredendicks indicated that their return would involve a big adjustment, to which Otto, Sr., replied that an adjustment would not be difficult because upon the children's return home everything would be fine. Sharon was then asked how she would avoid getting lost with the children should they be returned. She replied that it was no longer a problem, as she did not go far from her apartment and generally stayed in the neighborhood. Otto, Sr., then interjected that it would be his responsibility to take the children to the store and buy groceries. When Julie suggested that the Bredendicks attend a regular counseling program to air their feelings about the children's return and to discuss the adjustment problems which would attend their return, they responded that seeing Dr. Firling was sufficient and that they believed nothing would be necessary. Sharon then indicated that she saw Dr. Firling once a week for a five-minute session, during which he asked her how she was doing, and when she replied that she was doing fine, he dispensed her the medicine she needed for the ensuing week. Thereafter, Julie apprised them of some of the children's educational needs but admittedly did not go into great detail.

On May 24, 1977, Julie conducted a prescheduled visit between Karen and her parents at a DCFS office. At first, Karen appeared nervous and needed reassurance that her foster mother was present in a nearby room. For approximately 20 minutes Karen remained very quiet and then repeatedly inquired as to how long she had to visit with the Bredendicks. In another five minutes, Karen began to cry and Julie suggested that if the visit were terminated at this point perhaps Karen would not be so frightened at their next visit. The Bredendicks apparently did not object to this procedure.

On June 2, 1977, Julie visited the Bredendicks and asked for an evaluation of their visit with Karen. They replied that it had been fine, and when Julie informed Otto, Sr., that she had smelled liquor on his breath during the visit with Karen, he replied that as a joke someone had poured a drink on him before he left home that day. They both answered that their lawyer[2] had explained a letter from an endocrinologist which had been presented at a previous court hearing and both were asked concerning their understanding of Otto, Jr.'s condition, which had been diagnosed by the endocrinologist as psycho-social growth retardation due to maternal deprivation. Otto, Sr., replied that his son would be given more milk and vegetables. Julie then told them that the problem was so

---

[2] At this point in time, the Bredendicks retained private counsel. Due to their difficulty in meeting his fees, at the time of the hearing on the State's petition for the appointment of a guardian with power to consent to adopt, the public defender was assigned to represent them.

serious that nutritional alterations were not a complete remedy; that the doctor's finding revealed that Otto, Jr.'s growth rate had been retarded by the emotional environment in their home; that any emotional trauma could cause their son to stop growing again; and that this was the reason why DCFS had not scheduled visits with Otto, Jr., and had limited visitation with Karen. Sharon responded by stating that if her son were returned, she would avoid further growth stoppages by giving him more milk and vegetables. The Bredendicks were also asked how they would handle the needs of children this age (Otto, Jr., was then almost 10 years old and Karen was close to five years old); *i.e.*, taking them shopping, enrolling them in school, etc. Otto, Sr., replied that Sharon could handle these matters and, if she could not, he would. Sharon responded with the statement that she was afraid to go too far from the neighborhood for fear of becoming lost. In answer to a question as to what they did each day, Sharon told Julie that she cooked chicken and watched television while Otto, Sr., said that he remained in and around the apartment to discharge the duties of his employment by showing apartments to prospective tenants. Julie ended the interview by asking why, after so little contact with the children, they now sought their return. Otto, Sr., replied that he now felt his wife was okay and needed the children to make her happy and give her something to do.

Julie scheduled another visit with Karen at a DCFS office for June 14, and when Karen was escorted to the visiting room she balked and refused to enter. Julie and the foster mother invented a fantasy that they were attending a tea party. As they acted out the fantasy, Karen calmed sufficiently to allow the foster mother to leave. The Bredendicks were then admitted and asked to continue the fantasy with Karen. This visit lasted approximately 10 minutes longer than the first, but eventually Karen became fearful and nervous. When she demanded to leave, the visit was terminated. No further visits with Karen were requested.

On July 27, 1977, the Bredendicks petitioned for the return of their children, alleging that because of her mental disability, Sharon had been placed under medical care at the Reed Zone Center "which prevented her from exercising the amount of care and guidance over said child[ren], she would otherwise have exercised"; that Otto, Sr., had been unable to provide sufficient care and guidance for the children, as he was working day and night when he could find employment through temporary labor services; that Sharon has recovered and is capable of caring for the children; and that Otto, Sr., now manages the apartment building where they reside and thereby has the opportunity to provide care and guidance for the children. The record does not contain information regarding what proceedings, if any, were had on this petition.

On January 24, 1978, the State petitioned for the appointment of a

guardian with the power to consent to the adoption of the children, alleging that the Bredendicks failed (a) to maintain a reasonable degree of interest in their children, (b) to correct the reasons for removal within 24 months of the adjudication of neglect, and (c) to make reasonable progress toward the return of the children within such time period; that at the time of his 1973 placement with DCFS, Otto, Jr., showed signs of (a) severe neglect (including lack of speech and language development), (b) hoarding of food, (c) extreme aggressiveness, and (d) severe growth retardation; that such problems have been alleviated since placement; that at the time of her placement, Karen also displayed symptoms of severe neglect; and that "[a] court clinical conducted on both parents by Blanchard B. Reeb, M.D. and Robert Bussell, M.D. on June 22, 1977, found 'there is no evidence whatsoever that the natural parents have any capacity at all for providing for the needs of these two children, nor that they in any way are aware of, or sensitive to the needs of the children* * *. I would urgently recommend that the court move toward termination of parental rights.' "

At a hearing on the State's petition, Doris and Julie testified to the contents of the meetings outlined above. In addition, both gave opinions based upon their expertise as social workers and contacts they had with the parents. Doris opined that during the time she was on the case the Bredendicks had made only very small gains toward rehabilitation and did not appreciate the children's problems or the difficulties attendant with their return. Julie was of the opinion that the natural parents had no understanding of the children's needs; that they were concerned only with their own needs; and that they have not altered their lifestyle or attitudes toward coping with the children since their placement. During the course of cross-examination, Julie admitted that her opinion was influenced in part by the report of Dr. Reeb, which was based on his court-ordered examination of the parents.

Doris also testified that the Bredendicks had not requested that she forward letters to their children and, on cross-examination, she testified that although she was not 100% sure, she believed she informed the Bredendicks of the DCFS system of forwarding letters; that while on the case she did not facilitate visitation, as Otto, Jr., had expressed negative feelings toward his natural parents while in the foster home and, because Karen had not seen her natural parents since she was 12 months old, visits with her could have been detrimental because she had exhibited developmental delays at the time of placement and was presently fearful of strangers; and that as the length of time between visits increases, children tend to view their visitors as strangers.

During her cross-examination, Julie said that her supervisor accompanied her on her first visit to the Bredendick home because DCFS

records indicated that Otto, Sr., had a drinking problem and tended to be aggressive and abusive when drunk; that DCFS did not seek further reports from Dr. Firling, as his letter which the Bredendicks tendered to the Department indicated that he saw Sharon solely for the purpose of administering her medication; and that the special treatment which Otto, Jr., needed was a secure environment and the assurance that he would not be left, mistreated or caused to become lost.

The Bredendicks chose not to testify but did call Dr. Firling, a licensed psychiatrist, who testified that his examinations of the Bredendicks consisted of inquiring about their living situation to ascertain whether they were having any particular problems and how they were functioning; that he had diagnosed Sharon as an ambulatory schizophrenic who was well-maintained on medication and Otto, Sr., as an inadequate personality who, as far as he could ascertain, was functioning reasonably well; that his opinion that Sharon can function in society is based upon the absence of a need for hospitalization, her reliability in taking her medication, and her punctuality in arriving for their visits in a completely dressed condition. He further opined that Otto, Sr., would probably not be abusive if the children were returned.

At the close of all the evidence, the guardian ad litem declined to argue against a finding of unfitness, and the trial court then found that the Bredendicks had failed to maintain interest in their children and to make reasonable efforts and progress toward correction of the conditions responsible for the children's placement.

OPINION

Sharon contends that the State failed to prove her unfitness as a mother by clear and convincing evidence. Initially, it should be noted that as Otto, Sr., is now deceased, only the termination of Sharon's parental rights is before us.

■ ■ Where the State brings proceedings to terminate parental rights, such cases are viewed as *sui generis* and must be decided in accordance with the particular facts of each individual and varying situation. (*In re Hurley* (1976), 44 Ill. App. 3d 260, 357 N.E.2d 815.) While wide discretion is vested in the trial court in custody cases, the termination of parental rights must be established by clear and convincing evidence. (*In re Martin* (1977), 48 Ill. App. 3d 341, 363 N.E.2d 29.) Moreover, while a parent may be unfit to have custody of the children, it does not automatically follow that such parent is unfit to remain the child's legal parent with attendant rights and privileges. (*Hurley.*) On the other hand, the fact that a parent makes an attempt to rehabilitate himself or herself does not necessarily preclude a finding of unfitness where such attempt is unavailing. *In re Love* (1977), 50 Ill. App. 3d 1018, 366 N.E.2d 139.

██ █ Where the trial court has found parent(s) unfit, the standard of review was succinctly enunciated in *In re Jones* (1975), 34 Ill. App. 3d 603, 607-08, 340 N.E.2d 269, 273. There, it was stated:

> "[I]n determining whether * * * parental unfitness was proved by clear and convincing evidence, we bear in mind that the trial court's finding should not be disturbed unless it is contrary to manifest weight of the evidence [citation]; that the credibility of witnesses is a matter we must leave to the trier of the facts [citation]; and that reviewing courts of this State insist that a clear case establish the statutory ground for termination of parental rights before the best interests of the child or children can be considered [citation]."

In the instant cause, the State maintains that a clear and convincing case of unfitness has been established under the terms of the following provision:

> " 'Unfit person' means any person whom the court shall find to be unfit to have a child sought to be adopted, the grounds of such unfitness being any one of the following:
>
> *  *  *
>
> (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;
>
> *  *  *
>
> (m) Failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from his parents or to make reasonable progress toward the return of the child to his parents within 12 months after an adjudication of neglected minor * * *." (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D).)

Where the parents' attempts to see the child have been officially frustrated, it is the intent to establish and /or maintain contact with the child rather than actual contact which is determinative. *In re Smith* (1976), 38 Ill. App. 3d 217, 347 N.E.2d 292, *cert. denied sub nom. Smith v. Shafer* (1977), 431 U.S. 939, 53 L. Ed. 2d 256, 97 S. Ct. 2651, *cert. denied sub nom. Shafer v. Smith* (1977), 434 U.S. 817, 54 L. Ed. 2d 73, 98 S. Ct. 55; *In re Taylor* (1975), 30 Ill. App. 3d 906, 334 N.E.2d 194; *In re Overton* (1974), 21 Ill. App. 3d 1014, 316 N.E.2d 201; *In re Deerwester* (1971), 131 Ill. App. 2d 952, 267 N.E.2d 505.

Although, as noted above, termination proceedings are *sui generis*, we find the following passage from *In re Love* helpful in reviewing the instant proceeding:

> "In examining the testimony adduced in the hearing before the trial court it is clear that such evidence supports a finding that prior to the removal of the minors Anthony and Tina from their custody, the respondents almost totally failed to maintain a reasonable degree of interest in and concern for their children. The children

were rapidly approaching a critical and dangerous condition as far as their health was concerned because neither of the respondents fed them with any regularity. Frequently there was no food in the home of the respondents, even though the father was employed. The children were isolated and ignored if they cried. On occasion they were physically abused. These findings are clearly and convincingly supported by the evidence.

After the minors Anthony and Tina were removed from the custody of the respondents we determine from the evidence that the respondents attended meetings of an organization known as Parents Anonymous and visited the children when they were in the custody of the Illinois Department of Children and Family Services. The respondents underwent a psychological testing by the Will County Mental Health Clinic and made an attempt to receive counseling from a social worker from the same clinic. If visiting the children, seeking counseling and psychiatric assistance are per se sufficient to fulfill the requirements that parents maintain a reasonable degree of interest, concern and responsibility for their children, then the respondents in the instant case have met and surmounted that requirement. We do not, however, believe that such is the law in our State. In the instant case we have respondents who, after they lost custody of their children, made some determined albeit futile efforts to rehabilitate themselves as parents. The efforts of the respondents to acquire the training and traits of proper parenthood were unavailing. As we have previously set forth, the testimony of Sister Janthor was that the respondents were unable to develop a normal relationship with their children when they visited them. It was also this witness's testimony that the respondent mother related to her that their father did not really care about the children and did not want them back. A caseworker for the Department testified that the respondents were guarded and so isolated themselves that little could be done to assist them. The testimony of Dr. Egel was that neither of the respondents had the mental or emotional equipment to perform the role of a parent and that there was no program currently available which could rehabilitate them so they could perform such a role. The testimony of the respondents demonstrates that they did not benefit from the counseling they received. They failed to give a single concrete answer as to what they had learned from any program they had attended or counseling they received after they lost custody of their children. It is evident from the record that, pitiful as it may be, the respondents are not mentally equipped to maintain a reasonable degree of interest, concern or responsibility to

their children's welfare. We can only conclude that by clear and convincing evidence the State met the burden of proving the respondents to be unfit parents." 50 Ill. App. 3d 1018, 1023-24, 366 N.E.2d 139, 142-43.

Here, the testimony of the social workers and the endocrinologist's report established that at the time of the 1973 placement, both children were suffering developmental delays, and Otto, Jr., was suffering from psycho-social growth retardation. Thus, as was the case in *Love*, we believe the State established by clear and convincing evidence that at the time of placement the Bredendicks displayed a disturbing lack of interest in and concern for their children, and that the children's condition was rapidly approaching a critical and dangerous level.

For two years after the adjudication of neglect, there was no request by either Sharon or Otto, Sr., to visit the children, and no inquiry was made of DCFS regarding their health and well-being. The record does show that Sharon was hospitalized for all but six months of this period, but it does not reveal whether her condition and/or the rules of the institution prevented periodic inquiries as to the children's progress. When the DCFS was contacted regarding the children, Otto, Sr., made the call and he was the parent who participated more fully in the conferences with the social workers. Sharon apparently contributed little to such discussions. The only reason given for seeking return of the children was offered by Otto, Sr., and dealt with Sharon's rather then the children's needs and happiness. The record further discloses that Sharon was impassive regarding Karen's distress at their visitations and failed to display any recognition, much less concern, regarding the adjustment problems which would attend the return of the children. Moreover, although Dr. Firling testified that Sharon has progressed to the point where she functions reasonably well in society, he said nothing regarding her rehabilitation in regard to her fitness as a parent. In addition, Sharon admits that she still tends to get lost if she strays too far from her residence. Lastly, the DCFS social workers were of the opinion that the Bredendicks had done little to rehabilitate themselves, and their failure to appreciate the problems and needs of their children foreshadowed a future lack of rehabilitation.

■■ In light of the foregoing, we believe Sharon's unfitness was established by clear and convincing evidence, and yet when the character of the record in the instant case is compared with that described in *Love*—particularly in light of Otto, Sr.'s subsequent death—the gross disparity in the type of evidence presented in the two cases raises the question of whether the instant proceeding offends traditional notions of fair play requiring a new hearing. We believe it does, for the following reasons:

First, when the assistant State's Attorney approached the bench about scheduling a time to testify for Dr. Reeb, who conducted the court-ordered examination of the Bredendicks and whose conclusions in whole or in part contributed to Julie's opinion of the Bredendicks' lack of rehabilitative ability, the trial court replied that the doctor's time should not be taken up unnecessarily and suggested the State wait until after Dr. Firling testified. The State agreed and, in fact, did not call Dr. Reeb in rebuttal. Yet, the trial court was apprised of the conclusion reached by Dr. Reeb, as portions of his report were quoted in the State's petition. As Dr. Egel's report in *Love* was pivotal, we believe it incongruous to believe that the trial court failed to consider to some degree Dr. Reeb's opinion. Sharon, however, was deprived of the opportunity to cross-examine Dr. Reeb.

Second, although the record does not reveal any overt frustration of the parents' attempts to remain in contact with their children or rehabilitate themselves, the social workers (unlike those in *Love*) did not testify, except in vague terms, regarding what, if any, positive programs and procedures the parents were apprised of and how such procedures and programs could, if at all, further the family's continued contact and/or reunion.

Third, while (as Sharon acknowledges in her reply brief) a certain degree of informality in juvenile court proceedings aids the court in reaching a decision which best affords its protection to the children, the termination of parental rights is a very serious step and the *Love* case in our opinion exemplifies the flexible yet scrupulous care with which such proceedings should be conducted. The procedures employed prior to and during the court hearing in the instant case fall short of those employed in *Love*, and while we do not believe they were violative of due process, it appears that the finding was largely due to the conduct of Otto, Sr. We are not unmindful of the fact that a final judgment of Sharon's unfitness was rendered prior to her husband's death; however, the crux of the record before us highlights the opinion that the Bredendicks' lack of contact, when coupled with their failure to rehabilitate, places the children in danger—whether through visitation or their return—of emotional trauma which could endanger their well-being by reactivating their developmental delays and Otto, Jr.'s growth retardation. The only source of such trauma appearing in the record, however, was Otto, Sr.'s drinking problems which precipitated periods of aggression and abuse. Sharon, on the other hand, is at most portrayed as inept in an undefined degree.

■■ In light thereof, we cannot but conclude that the trial court's determination of her unfitness was grounded to some extent on her decision to remain with Otto, Sr., at the expense of her children's emotional and physical well-being. Accordingly, we believe the

subsequent death of Otto, Sr., when considered in light of the aforementioned procedural deficiencies, requires that the question of Sharon's unfitness be retried.

For the reasons stated, the judgment is reversed and the cause remanded for proceedings not inconsistent with the views expressed in this opinion.

Reversed and remanded.

LORENZ and WILSON, JJ., concur.