NOTICE

Decision filed 07/31/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240430-U

NO. 5-24-0430

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* ADOPTION OF M.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (Louise Bryant and James Bryant, | ) | Champaign County. |
| | ) | |
| Petitioners-Appellants, | ) | |
| | ) | |
| v. | ) | Nos. 21-AD-27, 23-AD-23 |
| | ) | |
| Jacqueline Larson, Illinois Department | ) | |
| of Children and Family Services, Roche Cain Sr., | ) | |
| William Larson, and Lisa Larson, | ) | |
| | ) | |
| Respondents-Appellees, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Taylor Renee Redeker, | ) | Honorable |
| | ) | Chad S. Beckett, |
| Petitioner-Appellee). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Barberis and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court did not err by denying the motion for judgment on the pleadings. The circuit court did not err by determining M.C. was available for adoption based on a valid specific consent solely naming M.C.'s foster parent and the circuit court's best interest determination was not against the manifest weight of the evidence. The circuit court did not err in denying the Bryants' motion for summary judgment as to fitness. The circuit court did not abuse its discretion by granting a motion to consolidate competing adoption petitions.

1

¶ 2     The petitioners, Louise Bryant and James Bryant (Bryants), appeal from a Champaign County order granting Taylor Redeker's petition to adopt M.C. The Bryants argue that the circuit court erred by denying their motion for judgment on the pleadings; the circuit court erred in finding that M.C. was not available for adoption by the Bryants; the circuit court's determination that it was in M.C.'s best interest for her foster mother to adopt M.C. was against the manifest weight of the evidence; the circuit court erred by denying their motion for summary judgment as to fitness; and the circuit court abused its discretion by granting the motion to consolidate competing adoption petitions. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                   I. BACKGROUND

¶ 4     M.C., born November 13, 2013, is the biological daughter of Jacqueline Larson (Mother) and Roche Cain Jr. (Father). Father passed away in an automobile accident prior to M.C.'s birth.

¶ 5     Mother had a history of abusing illegal substances. On August 27, 2019, the Department of Children and Family Services (DCFS) issued a safety plan and removed M.C. and her half-sisters, A.L., born January 22, 2002, and K.M., born March 17, 2006, from Mother's care. The children were initially placed with M.C.'s paternal grandmother, Louise Bryant, in St. Joseph, Illinois.

¶ 6     The State filed a petition for adjudication of neglect pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) alleging that M.C. and K.M. were in an injurious environment in Mother's care. See *In re* K.M. and M.C., No. 19-JA-78 (Cir. Ct. Champaign County).[1]

¶ 7     On February 6, 2020, DCFS placed M.C. and K.M. with fictive kin, Taylor Redeker, in Champaign, Illinois. Taylor was a friend of Father's sister, Kara Rewerts, and had helped Mother

_____

[1]A.L. was not named in the juvenile matter because she turned 18 on January 22, 2020.

2

take care of her children on several occasions after Father passed away. DCFS also created a service plan and directed Mother to complete a substance abuse evaluation, enroll in counseling, and engage in treatment through the Champaign Treatment Center.

¶ 8        The circuit court found that M.C. and K.M. were neglected, in an injurious environment, due to substance abuse by Mother. *In re K.M. and M.C.*, No. 19-JA-78 (Cir. Ct. Champaign County, June 25, 2020). A dispositional order entered in that juvenile matter on July 30, 2020, awarded custody and guardianship of M.C. and K.M. to the guardianship administrator of DCFS.

¶ 9        On April 23, 2021, the petitioners, Louise Bryant and James Bryant, filed an adoption petition to adopt M.C. and filed an amended petition on September 23, 2021. See *In re* Adoption of M.C., No. 21-AD-27 (Cir. Ct. Champaign County). The Bryants alleged that Mother was an unfit person under the Illinois Adoption Act and her parental rights should be terminated. The Bryants were not parties in M.C.'s juvenile case and did not have access to the confidential documents regarding Mother's progress with her DCFS service plan or Mother's fitness.

¶ 10        Mother entered her appearance in the adoption case and denied the allegations regarding her fitness in the Bryants' original petition. Mother additionally filed a motion to dismiss the Bryants' adoption petition alleging that DCFS had custody and guardianship of M.C. and that the circuit court did not have subject matter jurisdiction to proceed while the juvenile case was pending.

¶ 11        In the juvenile matter, Mother was required to satisfy the requirements of her DCFS service plan for the children to be returned to her care. The circuit court entered a permanency order on November 13, 2020, finding that Mother was making substantial progress and reasonable efforts toward the return of the minor children. See *In re* K.M. and M.C., No. 19-JA-78 (Cir. Ct. Champaign County). The circuit court, in the juvenile case, continued to find that Mother was

3

making reasonable progress and efforts on multiple permanency orders entered throughout 2021. Mother had progressed from supervised visitation to unsupervised visitation with the children four times a week.

¶ 12    Meanwhile, Mother was found in default in the Bryants' pending adoption matter in January of 2022. The Bryants then filed a motion for summary judgment against Mother, in the adoption case, alleging that more than nine months had passed since the entry of the order of adjudication of neglect in the juvenile matter; Mother failed to correct the conditions that led to the removal of her children; and, therefore, Mother was an unfit person as defined by section 1(D)(m)(i) and (ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2022)). No affidavits or supporting documentation were attached to the motion for summary judgment.

¶ 13    DCFS, as a respondent in the Bryants' adoption case, filed a motion to dismiss the Bryants' adoption petition. DCFS argued that M.C. was in the guardianship and custody of DCFS, and the juvenile court retained exclusive jurisdiction over the custody, guardianship, and placement of M.C. The circuit court granted DCFS's motion to dismiss.

¶ 14    The Bryants subsequently filed a motion to reconsider the circuit court's dismissal, as well as a motion to consolidate their adoption petition with the pending juvenile case, *In re* K.M. and M.C., No. 19-JA-78 (Cir. Ct. Champaign County). The circuit court denied the motions and the Bryants appealed the circuit court's decision. See *In re Adoption of M.C.*, 2022 IL App (5th) 220422-U.

¶ 15    This court found that the circuit court erred by dismissing the adoption petition for lack of jurisdiction and abused its discretion in denying the petitioner's motion to consolidate the adoption action with the pending juvenile proceeding. *In re Adoption of M.C.*, 2022 IL App (5th) 220422-

4

U. DCFS filed a petition for rehearing, which was denied on January 27, 2023. The circuit court's decision was reversed and remanded for further proceedings.

¶ 16    During this time, Mother relapsed in 2022. She tested positive for illegal substances and failed to appear for several drug tests. The circuit court, in the juvenile case, found that Mother was no longer making reasonable progress or reasonable efforts towards the return of her minor children. DCFS required that Mother complete a substance abuse assessment and Mother was recommended for intensive outpatient therapy in May of 2022. Supervised visitation resumed.

¶ 17    After the mandate issued in *In re Adoption of M.C.*, 2022 IL App (5th) 220422-U, Mother signed final and irrevocable consents for Taylor Redeker, the foster mother, to adopt M.C. and K.M.[2] Taylor Redeker filed a competing petition for the adoption of M.C.[3] See *In re* Adoption of M.C., No. 23-AD-23 (Cir. Ct. Champaign County). Taylor alleged that Mother had consented to Taylor adopting M.C., Father was deceased, and M.C. had been placed with Taylor since July 29, 2020. Taylor additionally alleged that it was in M.C.'s best interest to grant Taylor's adoption petition. Taylor anticipated that DCFS, the guardian of M.C., would enter its appearance and consent to the adoption. Taylor additionally filed a motion to consolidate the petition filed by the Bryants (*In re* Adoption of M.C., No. 21-AD-27 (Cir. Ct. Champaign County)) with her petition (*In re* Adoption of M.C., No. 23-AD-23 (Cir. Ct. Champaign County)).

¶ 18    The circuit court held a hearing on the consolidation of the two competing adoptions. The Bryants opposed consolidation. They argued against a joint trial because their adoption petition had been pending for over two years. DCFS had no objection to consolidation to determine the best interests of the minor. The circuit court granted the motion to consolidate the adoption cases.

---

[2]Taylor adopted K.M. in *In re Adoption of K.M.*, No. 23-AD-35 (Cir. Ct. Champaign County, July 19, 2023).

[3]The Bryants' petition for adoption was reinstated upon remand by this court.

¶ 19    The trial began on November 6, 2023. The Bryants argued for a motion for judgment on the pleadings as to Mother and DCFS, as neither of those parties had filed responsive pleadings to the Bryants' amended adoption petition. The circuit court denied the motion.

¶ 20    The Bryants additionally argued for summary judgment on the issue of Mother's fitness. They claimed that Mother was unfit where she failed to make reasonable efforts during the nine-month period under the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)). DCFS had filed an objection to the summary judgment motion and argued that a fitness determination was not necessary because M.C. was only available for adoption by Taylor based on the irrevocable consent signed by Mother, and M.C. was not available for adoption by the Bryants under the Adoption Act.

¶ 21    The circuit court considered that the Bryants were not parties to the juvenile proceedings; and they had not sought leave to intervene in the juvenile matter. The juvenile court had accepted the irrevocable consent signed by Mother which stated M.C. could only be adopted by Taylor. The circuit court denied the Bryants' motion for summary judgment.

¶ 22    The parties waived opening statements and the parties agreed that the Bryants would present their case first. Louise Bryant, M.C.'s paternal grandmother, testified that she helped care for M.C. after M.C.'s birth. On August 2, 2019, Mother had called Louise because DCFS was removing Mother's children from her care pursuant to a safety plan. The DCFS caseworker brought Mother's children to Louise's house.

¶ 23    Louise owned a 3500 square foot, five-bedroom house. M.C. and K.M. had their own bedrooms. A.L. had initially moved in with Louise when the children were removed from Mother's care. Subsequently, A.L. decided to move in with her grandfather, Roche Cain Sr. K.M. and M.C. stayed with Louise until February 6, 2020.

¶ 24    Louise did not know why the children were removed from her care, but believed they were removed at Mother's request. Mother's parental rights had not been terminated, and she wanted the children to live closer to her and be involved in their schooling. When the children were being removed, M.C. cried and said that she did not want to leave. Initially, Louise was not told where M.C. was placed. Louise was not able to see M.C. until the summer of 2020, when she learned that M.C. was living with Taylor. DCFS required Louise to participate in supervised visitation for three weeks, before Louise was able to arrange visitation with M.C. through Taylor. Louise did not know why supervised visitation was required.

¶ 25    Louise only sought to adopt M.C., and not K.M., because Louise did not believe that K.M. wanted to live with the Bryants. Louise testified that when K.M. and M.C. were in her care, the two girls were not close to one another. K.M. was "rude" and "mean" to M.C. When asked whether she had considered the emotional and psychological effect of separating M.C. from Taylor, Louise stated that "it'll be hard for everyone." But Louise indicated she would seek help for M.C., if necessary. Louise acknowledged that in 2023, M.C. stated she wanted to live with Taylor. Before that, M.C. told Louise that M.C. wanted to live with the Bryants.

¶ 26    Louise testified that she wanted to adopt M.C. because of a promise that she made to her son, and Louise loved M.C. Louise had taken over 8000 photographs and videos of M.C. A variety of photographs of M.C. from 2016 through 2023 were admitted into evidence depicting M.C.'s relationship with Louise.[4]

¶ 27    The next witness called was Brenda Beals, a kindergarten teacher at St. Joseph Grade School. She testified that M.C. was in her kindergarten class. Brenda stated that after M.C. was

---

[4]The photographs were admitted into evidence but not included in the record on appeal. The Bryants filed a motion to supplement the record on appeal to include those photographs, and their motion is granted.

removed from Louise's care, Louise surprised M.C. at school. When M.C. saw Louise, "her eyes lit up and she just ran and hugged her and didn't want to let go." Brenda also saw M.C. interact with Taylor and M.C. went "very willingly" to Taylor after school. Brenda testified that she had limited interaction with Taylor because of remote learning due to COVID-19.

¶ 28 The Bryants next presented several friends and family members who all testified that M.C. and Louise had a positive relationship. One of those witnesses was Vicki Nelson, Louise's sister. She testified that Louise was a "fantastic grandmother" who would organize themed birthday parties and other holiday parties. Vicki wanted Louise to adopt M.C. because they were family.

¶ 29 Vicki testified to issues between Louise and K.M., including an incident where Louise had taken K.M.'s phone away. K.M. told Mother that K.M. did not want to stay at Louise's house. Mother made a request to DCFS to place M.C. and K.M. together with Taylor. Both children were removed from Louise's care at Mother's request.

¶ 30 Jim Bryant, M.C.'s grandfather by marriage, testified regarding the time when M.C. lived with him for six or seven months. M.C. liked doing activities with her grandparents, including bowling and playing with their chickens. Jim believed it was in M.C.'s best interest for the Bryants to adopt M.C. because M.C. was family and they loved her. Jim testified that he overheard K.M. being "mean" to M.C., but he could not recall details. Louise would address those situations. When M.C. would visit the Bryants, she would ask, "when am I gonna be able to stay here all the time?"

¶ 31 Taylor would inform the Bryants about events that M.C. participated in so the Bryants could attend. Jim testified that "[M.C.'s] been with Taylor long enough now that that's where she's accustomed to." He did not have any knowledge of Taylor doing anything that was not in M.C.'s best interest.

¶ 32   Jim did not understand why M.C. and K.M. were removed from his home. He believed that K.M. did not want to live in a rural setting. She wanted to live in town near her friends. He had discussed adopting both K.M. and M.C. with Louise, but they decided that K.M. was not interested in living with them. Jim did not participate in supervised visits with M.C., and he did not have any foster care training.

¶ 33   The circuit court then turned to Taylor's adoption petition. Taylor called Randall Bost, M.C.'s third grade teacher, as her first witness. Although M.C. was no longer in his class, M.C. would frequently stop by Randall's classroom and talk to him. M.C. spoke highly of Taylor and loved living with her. Randall testified that M.C. was a "fantastic student." She was happy, worked hard, and had many friends. Randall met Taylor during parent-teacher conferences. Taylor helped M.C. with schoolwork and M.C. would turn in her assignments on time.

¶ 34   Pricila Godinez was the foster care caseworker with the Center for Youth and Family Solutions (CYFS) and had recently been promoted to foster care supervisor. Pricila testified that she had worked with M.C.'s family since 2022. Mother began receiving intact services with DCFS after Mother's boyfriend overdosed, and the children had been present. CYFS provided services to Mother to support the goal of having the children return home.

¶ 35   Pricila testified that while the children were in Taylor's care, they were "always clean" and "appeared happy." The children appeared to be close to Taylor and she provided a nurturing home. Pricila had observed that M.C. would tell Taylor about her day and tell Taylor stories about her friends. In Pricila's opinion, M.C. should remain with Taylor because M.C. had lived with Taylor for many years; M.C.'s sibling was in Taylor's home; and M.C.'s removal from her home and sister could be traumatizing. M.C. needed stability.

¶ 36    Pricila testified that when DCFS started the process to terminate Mother's parental rights and move towards the goal of adoption, Pricila investigated whether the children should remain with Taylor. Pricila had asked M.C. to think about who she wished to live with if she were unable to return to her Mother and to write her answer in a letter. K.M. was not asked to write a letter because she clearly wished to live with Taylor. Pricila testified to two letters, Exhibits 1 and 2, that she had received from M.C. In both letters, M.C. stated that she wanted to stay with Taylor.

¶ 37    Pricila testified that she was present in juvenile court during Mother's surrender of parental rights proceedings on March 30, 2023. When Mother signed the surrender in court, DCFS changed the goal in M.C.'s juvenile case from return home to adoption by Taylor. The same change was made in K.M.'s case. The consent was signed after the State had filed a petition to terminate Mother's parental rights but before a termination hearing commenced.

¶ 38    CYFS explained that supervised visitation started with Louise after Taylor reported that Louise made a comment about M.C. to Taylor while M.C. was present. Louise had asked, "You're not gonna adopt her, right?" Taylor additionally reported that M.C. had "made a face of being uncomfortable" when she overheard the comment. Pricila was concerned that the comment created stress for M.C. Monthly supervised visits between M.C. and Louise were arranged through CYFS.

¶ 39    Sarah Stumpf then testified. Her occupation was to provide equine-assisted therapy. Horses helped patients release serotonin and they brought "a sense of calmness and peace" during therapy sessions. M.C. participated in equine therapy once a week for approximately a year and a half. M.C. was initially shy and had a difficult time explaining her feelings when she started therapy. Over time, M.C. had grown more confident and expressed that she felt safe with Taylor.

¶ 40    Lisa Wade, the adoption supervisor with CYFS, testified that a report was prepared that recommended that M.C. remain with Taylor. M.C. had "a significant emotional attachment" to

Taylor and had lived with Taylor for three years. M.C. was doing well, and Taylor was able to meet M.C.'s needs. Lisa further testified that if M.C. were removed from Taylor's care, it would be detrimental to M.C. because she was familiar and comfortable with Taylor.

¶ 41　K.M. testified that she lived with Taylor and M.C. in Champaign, Illinois. K.M. was a senior in high school, had a 4.0 GPA, and was a varsity cheerleader. After high school, K.M. planned on living at home with Taylor and M.C., and planned to attend a beauty school in Urbana, Illinois. K.M. testified that her older sister, A.L., would visit Taylor's house for lunch and the three sisters enjoyed spending time together. K.M. testified that she "felt complete" and "happy" when she was adopted by Taylor.

¶ 42　According to K.M., when the children were initially placed with Louise, A.L. felt unwelcome and unhappy. K.M. felt "belittled" at Louise's house. K.M. testified that she and Louise would argue, and, on one occasion, it almost became physical. They were "screaming in an argument" and Louise moved towards K.M. "very fast." Louise had claimed that she was attempting to hug K.M. and K.M. pushed her away because she felt attacked. K.M. additionally felt that she was treated differently than M.C. K.M. told Mother that she felt uncomfortable. In response, Mother contacted Taylor and DCFS for K.M. to leave the Bryants' house. K.M. wanted to stay with M.C. and M.C. was also removed.

¶ 43　Roche Cain Senior, M.C.'s paternal grandfather, testified that Louise was his ex-wife. Their son was engaged to Mother, who was not a good person. Mother had placed her children in an unsafe living environment. Roche testified that he met Taylor through his son, and Louise's daughter, Kara Rewerts. Before the children were removed from Mother's care, Taylor would help Mother by taking the children to school and the children would stay with Taylor on the weekends.

11

A.L. would contact Taylor directly if there were people in Mother's home that A.L. did not feel safe around. Taylor would pick up the children when A.L. called.

¶ 44    Roch testified that K.M. and A.L. were not happy with the Bryants. A.L. had moved in with Roch, while K.M. and M.C. stayed with the Bryants. Roch believed that M.C. was happy with the Bryants and that the Bryants loved M.C.

¶ 45    While the children were with Taylor, Roch would visit with M.C. and K.M. He would contact Taylor directly to see his grandchildren. Roch would help Taylor pick up a child from school, if needed, and the children would sometimes stay the weekend at his house. As their grandfather, he felt like he had a good relationship with M.C. and K.M. Roch additionally felt like he would be able to continue his relationship if Taylor adopted M.C.

¶ 46    Taylor testified that she was friends with Father's sister, Kara, and met Mother through that connection. After Father passed away, Taylor offered to help take the children to school and run errands. Taylor formed a relationship with A.L. because A.L. found Taylor to be a trusted adult. After M.C.'s birth, Taylor saw M.C. often.

¶ 47    In January of 2020, Mother had asked Taylor to take in K.M. and M.C. because the arrangement at the Bryants' home was not working. Taylor agreed to care for the children until they could reunite with Mother. Taylor became a licensed foster parent after K.M. and M.C. were placed in her home. Taylor was required to complete a DCFS fingerprint screening, a background check, and complete two courses to become a foster parent. Mother eventually signed an irrevocable consent, specifying that Mother wished for Taylor to adopt M.C. and K.M.

¶ 48    Taylor was approached by the Bryants in February of 2020, about visitation with M.C. Louise would text Taylor when Louise wanted to see M.C. and Taylor arranged for M.C. to spend time with her grandmother. However, visitation changed to supervised visitation after Louise

12

asked Taylor if she was going to try to adopt M.C., and M.C. had overheard the conversation. Taylor reported the conversation to the caseworker and the caseworker wanted to "keep an eye on conversations."

¶ 49    Taylor testified that she encouraged M.C. to maintain a relationship with her grandparents and wanted M.C. to continue to spend time with Louise after M.C.'s adoption. M.C. was well adjusted in Taylor's care. Taylor testified that M.C. felt loved and valued in Taylor's home. M.C. and K.M. developed a strong attachment to each other and Taylor bonded with both girls. M.C. had stated that she wanted to live with Taylor.

¶ 50    Taylor additionally testified that M.C. had excelled in school after COVID-19. M.C. was shy at first, but she made friends easily. M.C. had developed socially and in the classroom. M.C.'s life had been stable for several years with Taylor and K.M. In her opinion, separating M.C. from K.M. would negatively impact M.C.

¶ 51    After Taylor's testimony, she offered no further evidence in support of her adoption petition. The Bryants requested leave to have Louise testify as a rebuttal witness to Taylor's testimony. Taylor objected to Louise testifying as a rebuttal witness when both parties were petitioners in separate adoption proceedings. The circuit court allowed further testimony.

¶ 52    Before Lousie testified again, the circuit court inquired whether DCFS had consented to Taylor adopting M.C. The circuit court confirmed that Taylor had filed an amended adoption petition that included as attachments the consent of the guardianship administrator of DCFS along with Mother's irrevocable consent which had been approved by the juvenile court. The Bryants objected to the amended petition being filed without leave of court. The circuit court denied the Bryants' objection and allowed the amended petition.

¶ 53   The circuit court additionally addressed the issue that on November 7, 2023, DCFS had filed an answer to the Bryants' amended adoption petition. The circuit court recalled that it had ordered DCFS to file an answer at the Bryants' request. The Bryants did not raise any objections to DCFS having filed its answer and the circuit court proceeded with the rebuttal testimony.

¶ 54   Louise testified to the disagreements that she had with K.M. and denied belittling or pushing K.M. K.M. had accused Louise of trying to hurt K.M., but that was not Louise's intention. K.M. was not included in the Bryants' adoption petition because Louise did not believe that K.M. wanted to live with her. Louise further testified that she never spoke of adoption in front M.C. This concluded the rebuttal testimony.

¶ 55   The guardian *ad litem* (GAL) testified that she met with the Bryants, and she also met with M.C. at Taylor's home. The Bryants' home was "perfectly nice" and "very pleasant." Taylor's home was adequate and appropriate for M.C.

¶ 56   The GAL testified that M.C. wanted to be adopted by Taylor. When the GAL met with M.C. on November 8, 2023, M.C. prepared a note for the GAL to bring to court. M.C.'s note, which was admitted into evidence, stated, "I would love to live with Taylor." The GAL additionally confirmed that M.C. had written the letters given to Pricila that had been marked as Exhibits 1 and 2. M.C. had completed a school project of her "special person," and M.C. chose to draw a picture of Taylor with hearts. M.C. also made Taylor a Mother's Day card.

¶ 57   The GAL also met with the Court Appointed Special Advocate (CASA) assigned to M.C. On June 12, 2023, M.C. told her CASA advocate that M.C. wanted to live with Taylor. M.C. additionally told her CASA advocate that she did not like it when Louise asked M.C. where she wanted to live because M.C. thought it would be "rude" to say "I don't want to live with you. I want to live with Taylor." Taylor made M.C. feel "safe and taken care of."

¶ 58    The GAL recommended that Taylor be allowed to adopt M.C. based on the factors listed under section 15.1 of the Adoption Act. 750 ILCS 50/15.1 (West 2022). M.C. wished to be adopted by Taylor and found a "home and a parent figure" with Taylor. M.C. had known Taylor since M.C. was a baby, and they had a strong bond. M.C.'s older sisters were welcome at Taylor's house. M.C. wanted to live with her sister, K.M., who was adopted by Taylor. M.C. liked her grandparents and would like to continue to spend time with them, but ultimately, she wished to be adopted by Taylor.

¶ 59    The parties presented closing arguments on the best interest issue. DCFS argued that neither Mother nor DCFS had consented to the Bryants' adoption petition and M.C. was not available for adoption by the Bryants. The circuit court questioned DCFS regarding the length of time that the juvenile case had been pending and whether a finding could be made that DCFS abused its discretion by withholding consent for adoption to the Bryants. DCFS argued that decisions to terminate parental rights were made on a case-by-case basis by the State, and the Bryants were not entitled to a proceeding to terminate Mother's parental rights. Mother had not been found unfit and DCFS proceeded with Mother's consent to Taylor's adoption of M.C. After Mother consented, the circuit court was then required to consider whether Mother's choice was in M.C.'s best interest. DCFS further argued that a current foster parent who had cared for a child for a continuous year period was given a preference under the Adoption Act.[5]

¶ 60    The circuit court took the best interest determination under advisement. On February 27, 2024, the circuit court issued a formal written memorandum and order on the legal standing of the parties as well as its best interest findings regarding M.C. The circuit court determined that the Bryants had the right to petition the court to adopt M.C. However, M.C. was not yet legally

---

[5]750 ILCS 50/15.1 (West 2022).

available for adoption by the Bryants. On the other hand, M.C. was available for adoption by Taylor based on Mother's specific consent allowing Taylor to proceed with M.C.'s adoption. If Taylor's adoption petition was denied, then Mother's parental rights would be restored until a further adjudication terminated her parental rights or until the circuit court determined that adoption was in M.C.'s best interests based on the execution of a new consent by Mother.

¶ 61 The circuit court then considered the merits of Taylor's petition based on the best interest factors set forth in section 1-3(4.05)(a) through (j) of the Juvenile Court Act (705 ILCS 405/1-3(4.05)(a)-(j) (West 2022)). The evidence presented by the Bryants was considered to the extent that it negated the merits of Taylor's petition. The circuit court found that Taylor's petition met every best interest factor and that Taylor had "exceeded her burden." The circuit court found in favor of Taylor's petition after applying the best interest factors to the evidence presented.

¶ 62 The circuit court also recited an alternative disposition by comparing the Bryants' petition and Taylor's petition concurrently. The circuit court considered the best interest factors and found that it was in M.C.'s best interest for Taylor to adopt, rather than the Bryants. Notably, the circuit court considered that M.C. "clearly loves the Bryants as her grandparents, but, in the opinion of this Court, [M.C.] does not see them as her *parents*." (Emphasis in original.) The circuit court further concluded that removal of M.C. from her current placement would jeopardize M.C.'s sense of security, familiarity, and continuity of her affection toward everyone she grew close to during the last four years. This appeal followed.

¶ 63                                  II. ANALYSIS

¶ 64 The Bryants raise five issues on appeal: (1) that the circuit court erred by denying their motion for judgment on the pleadings; (2) the circuit court erred by determining that M.C. was not available for adoption by the Bryants; (3) the circuit court's best interest determination was against

the manifest weight of the evidence; (4) the circuit court erred by denying their motion for summary judgment as to Jacqueline Larson's fitness; and (5) the circuit court erred by consolidating the competing adoption petitions.

¶ 65                                    1. Judgment on the Pleadings

¶ 66    A motion for judgment on the pleadings pursuant to section 2-615(e) of the Code of Civil Procedure (735 ILCS 5/2-615(e) (West 2022)) tests the sufficiency of the pleadings by determining whether the petitioners are entitled to the relief sought by their petition. *Pekin Insurance Co. v. Allstate Insurance Co.*, 329 Ill. App. 3d 46, 49 (2002). The motion requires the circuit court to examine the pleadings, taking as true the well-pleaded facts, and to determine whether there is an issue of fact or whether the controversy can be resolved as a matter of law. *Hess v. Loyd*, 2012 IL App (5th) 090059, ¶ 17. The standard of review for a denial of a motion on the pleadings is *de novo*. *Hess*, 2012 IL App (5th) 090059, ¶ 17.

¶ 67    Allegations in pleadings which are not denied are deemed admitted. 735 ILCS 5/2-610(b) (West 2022). However, invoking the language of section 2-610 of the Code (735 ILCS 5/2-610 (West 2022)) where a respondent inadvertently fails to file an answer would circumvent the legislature's intent of the Code to "be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties." 735 ILCS 5/1-106 (West 2022); *Crawford County Oil, LLC v. Weger*, 2014 IL App (5th) 130382, ¶ 14. Section 2-610 of the Code does not mandate a finding that all of the allegations of the complaint are deemed admitted when no answer is filed. *Weger*, 2014 IL App (5th) 130382, ¶ 14. Additionally, "[t]he circuit court has the discretion to manage its docket to ensure that there is no undue delay in the resolution of the proceedings before it." *Bank of America, N.A. v. Land*, 2013 IL App (5th) 120283, ¶ 24.

17

¶ 68 The request for judgment on the pleadings was made before the start of trial. The circuit court denied the motion without explanation. Subsequently, DCFS filed its answer to the Bryants' amended petition. After testimony was taken, the circuit court noted that DCFS had filed its answer to the amended petition. At that time, the Bryants did not raise an objection to the filing of DCFS's answer. "An objection that an issue was not formally raised by the pleadings may be waived by the conduct of the parties or by the introduction of evidence on the issue at trial." *In re Marriage of Hochleutner*, 260 Ill. App. 3d 684, 689 (1994). As such, we find that the circuit court did not error in its denial of the Bryants' motion for judgment on the pleadings where DCFS inadvertently failed to file an answer before trial; DCFS subsequently filed an answer as allowed by the circuit court; and the Bryants failed to object to the filing of the answer by DCFS.

¶ 69                        2. "Available for Adoption"

¶ 70 Parents may exercise some control over the adoption of their child, pursuant to the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re Adoption of L.R.B.*, 278 Ill. App. 3d 1091, 1093 (1996). After the transfer of legal custody or guardianship of the person, the parent has some "residual parental rights and responsibilities" including the right to consent to adoption. 705 ILCS 405/1-3(13) (West 2022). Control by the parents exists under the Adoption Act if the child is available for adoption and if the adoption sought by the parent is in the best interests of the child. *In re Taylor D.*, 368 Ill. App. 3d 854, 860 (2006). We apply *de novo* review to the question of whether M.C. was available for adoption by the Bryants under the Adoption Act. *Taylor D.*, 368 Ill. App. 3d at 858.

¶ 71 A person is "available for adoption" under the Adoption Act when the person is

> "(a) a child who has been surrendered for adoption to an agency and to whose adoption the agency has thereafter consented;

18

(b) a child to whose adoption a person authorized by law, other than his parents, has consented, or to whose adoption no consent is required pursuant to Section 8 of this Act;

(c) a child who is in the custody of persons who intend to adopt him through placement made by his parents;

(c-1) a child for whom a parent has signed a specific consent pursuant to subsection O of Section 10;

(d) an adult who meets the conditions set forth in Section 3 of this Act; or

(e) a child who has been relinquished as defined in Section 10 of the Abandoned Newborn Infant Protection Act." 750 ILCS 50/1(F) (West 2022).

¶ 72    Under section 10(O)(1) of the Adoption Act, a parent with a juvenile petition pending under the Juvenile Court Act (705 ILCS 405/2-13 (West 2022)) may, with the approval of the designated representative of DCFS, execute a consent to adoption by a specified person:

"(a) in whose physical custody the child has resided for at least 6 months; or

(b) in whose physical custody at least one sibling of the child who is the subject of this consent has resided for at least 6 months, and the child who is the subject of this consent is currently residing in this foster home; or

(c) in whose physical custody a child under one year of age has resided for at least 3 months." 750 ILCS 50/10(O)(1) (West 2022).

¶ 73    A foster parent who has cared for a child continuously for a year may seek consent to adopt a child from the child's guardian. 750 ILCS 50/15.1(a) (West 2022). The guardian shall give preference and first consideration to that applicant over other applications. 750 ILCS 50/15.1(b) (West 2022). The guardian shall consider all relevant best interest factors including, but not limited to:

"(1) the wishes of the child;

(2) the interaction and interrelationship of the child with the applicant to adopt the child;

19

(3) the child's need for stability and continuity of relationship with parent figures;

(4) the wishes of the child's parent as expressed in writing prior to that parent's execution of a consent or surrender for adoption;

(5) the child's adjustment to his present home, school and community;

(6) the mental and physical health of all individuals involved;

(7) the family ties between the child and the applicant to adopt the child and the value of preserving family ties between the child and the child's relatives, including siblings;

(8) the background, age and living arrangements of the applicant to adopt the child;

(9) the criminal background check report presented to the court as part of the investigation required under Section 6 of this Act." 750 ILCS 50/15.1(b) (West 2022).

The court has sole discretion over the final determination of the propriety of the adoption and shall consider the best interest factors in subsection (b). 750 ILCS 50/15.1(c) (West 2022).

¶ 74 The Bryants argue that consent was not necessary to proceed with their amended adoption petition because Mother was unfit, and, therefore, M.C. was available for adoption based on section 8(a)(1) of the Adoption Act. Under section 8(a)(1) of the Adoption Act,

"consents or surrenders shall be required in all cases, unless the person whose consent or surrender would otherwise be required shall be found by the court:

(1) to be an unfit person as defined in Section 1 of this Act, by clear and convincing evidence." 750 ILCS 50/8(a)(1) (West 2022).

¶ 75 M.C. was under DCFS's guardianship and had been placed in a foster home with Taylor for several years. M.C. was available for adoption by Taylor pursuant to section 1(F)(c-1) of the Adoption Act (750 ILCS 50/1(F)(c-1) (West 2022)) where Mother had signed a final and irrevocable consent prior to a fitness hearing pursuant to section 10(O)(1). DCFS had also consented to Taylor's adoption petition regarding M.C. pursuant to section 15.1.

20

¶ 76    A fitness hearing had not occurred before M.C. was available for adoption by Taylor based on Mother's specific valid consent naming Taylor as the specified person to adopt M.C. Because Mother had executed a specific consent for Taylor to adopt M.C. before the fitness determination occurred, Mother retained some control over M.C.'s adoption, and M.C. was not available for adoption by the Bryants.

¶ 77                                  3. Best Interest

¶ 78    The circuit court may deny an adoption if it finds that the adoption was not in the child's best interest, even with DCFS's consent. See 750 ILCS 50/15.1(d) (West 2022). The Adoption Act is construed in concert with the Juvenile Court Act (750 ILCS 50/2.1 (West 2022)). The best interest considerations under the Juvenile Court Act and the Adoption Act are not mutually exclusive. *In re M.M.*, 156 Ill. 2d 53, 67 (1993). The Juvenile Court Act best interest considerations are limited to a determination of whether it is in the child's best interests to be freed for adoption, in the context of a termination proceeding. *M.M.*, 156 Ill. 2d at 67. The Adoption Act best interest considerations are made during adoption proceedings and concern the appropriateness of a particular adoption. *M.M.*, 156 Ill. 2d at 67. The ultimate factor in the adoption determination is the best interests of the child, and no single factor is given greater value than any other factor. *M.M.*, 156 Ill. 2d at 70.

¶ 79    An adoption judgment involving the best interest of a child will not be overturned unless the circuit court clearly abused its discretion, and the judgment was against the manifest weight of the evidence. *In re Adoption of C.D.*, 313 Ill. App. 3d 301, 307 (2000). The circuit court is in the best position to assess the credibility of the evidence and witness testimony. *C.D.*, 313 Ill. App. 3d at 308. Great deference is given to the circuit court in making credibility determinations and we

21

will not substitute our judgment for the judgment of the circuit court. *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 70.

¶ 80   During the trial, evidence concerning the best interest factors under the Adoption Act (750 ILCS 50/15.1(b) (West 2022)) was presented. The circuit court additionally considered the best interest factors under the Juvenile Court Act. See 705 ILCS 405/1-3(4.05)(a)-(j) (West 2022).

¶ 81   The GAL testified that M.C. wished to be adopted by Taylor, who had been in her life since birth and her foster parent since February of 2020. M.C.'s third grade teacher testified that M.C. was a "fantastic student." She was happy, worked hard, and had many friends in Taylor's care. M.C.'s equine therapist testified that after several months of therapy, M.C. was able to share that she felt safe with Taylor. M.C.'s sister, K.M., was adopted by Taylor, and it was in M.C.'s interest to stay and maintain her bond with K.M. It was also Mother's wish for Taylor to adopt M.C. A home study and background check had been performed, and Taylor's home was an adequate placement for M.C. Taylor was a parent figure in M.C.'s life and the circuit court considered that removal of M.C. from her placement with Taylor would jeopardize M.C.'s sense of security, familiarity, and continuity of her affection for everyone she had grown close to during the last four years. The circuit court's determination that it was in M.C.'s best interests to grant Taylor's adoption petition was not against the manifest weight of the evidence.

¶ 82                         4. Summary Judgment

¶ 83   The Bryants argue that the circuit court erred by denying their motion for summary judgment which should have found Mother unfit, thereby making M.C. available for adoption by the Bryants. Summary judgment is proper if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West

22

2022). We apply a *de novo* standard of review to a circuit court's decision on a motion for summary judgment. *Sameer v. Butt*, 343 Ill. App. 3d 78, 85 (2003).

¶ 84    DCFS argues that the fitness determination is moot. We agree. An issue on appeal is considered moot where "events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006). Because M.C. was available for adoption by Taylor and the circuit court determined that it was in M.C.'s best interest for Taylor to adopt M.C., a fitness determination was not necessary. The Bryants' motion for summary judgment is moot.

¶ 85                                5. Consolidation

¶ 86    The Bryants additionally argue that the circuit court abused its discretion by consolidating the competing adoption petitions. "[A]ctions pending in the same court may be consolidated, as an aid to convenience, whenever it can be done without prejudice to a substantial right." 735 ILCS 5/2-1006 (West 2022). "Consolidation is proper when the cases involve almost identical issues and the failure to consolidate could result in inconsistent judgments." *In re Marriage of Reidy*, 2018 IL App (1st) 170054, ¶ 24. We review a circuit court's ruling on a motion to consolidate for an abuse of discretion. *Turner v. Williams*, 326 Ill. App. 3d 541, 546 (2001). The circuit court abuses its discretion when no reasonable person would take the same view. *Reidy*, 2018 IL App (1st) 170054, ¶ 26.

¶ 87    The overriding concern of the Adoption Act is the best interests of the child. *In re Marriage of T.H.*, 255 Ill. App. 3d 247, 253 (1993). The circuit court allowed the Bryants to participate in the best interests hearing, while keeping the files and docket numbers distinct. After hearing extensive evidence from the Bryants, Taylor, and their witnesses, in support of each adoption petition, the circuit court reached its conclusion that it was in the best interests of M.C.

23

that she be allowed to be adopted by Taylor. Moreover, the consolidation allowed the circuit court to hear evidence regarding the best interest factors pursuant to each of the petitions for adoption. This led the circuit court to also find, as an alternative disposition, that even if M.C. had been available for adoption by the Bryants, it was still in M.C.'s best interest to grant Taylor's adoption petition.

¶ 88    Permitting the overlapping issue of M.C.'s best interest allowed the circuit court to make an expeditious resolution on the competing adoption proceedings. The circuit court did not abuse its discretion in consolidating the matters.

¶ 89                                III. CONCLUSION

¶ 90    For the reasons stated, we affirm the judgment of the circuit court of Champaign County.

¶ 91    Affirmed.